No. 02-301

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 359

THE GREAT FALLS TRIBUNE; THE BILLINGS GAZETTE; THE MONTANA
STANDARD; THE HELENA INDEPENDENT RECORD; THE MISSOULIAN;
BIG SKY PUBLISHING, INC., d/b/a THE BOZEMAN DAILY CHRONICLE;
THE MONTANA NEWSPAPER ASSOCIATION; THE MILES CITY STAR;
THE LIVINGSTON ENTERPRISE; YELLOWSTONE PUBLIC RADIO; THE
ASSOCIATE PRESS, INC.; and THE MONTANA BROADCASTERS ASSOCIATION,
        Petitioners and Appellants,

    v.

THE MONTANA PUBLIC SERVICE COMMISSION,
        Respondent and Cross-Appellant,

    and

THE MONTANA POWER COMPANY, n/k/a NORTHWESTERN ENERGY, LLC,
        Intervenor and Respondent.

APPEAL FROM:    District Court of the First Judicial District,
               In and for the County of Lewis and Clark, Cause No. CDV 2001-708,
               The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

               Peter Michael Meloy and Jennifer S. Hendricks (argued), Meloy Law Firm,
               Helena, Montana

        For Respondent:

               Robin A. McHugh (argued), Montana Public Service Commission, Helena,
               Montana

        For Intervenor:

                Marjorie L. Thomas, Michael P. Manion (argued), Northwestern Energy,
               LLC, Butte, Montana

        For Amici:

                John Alke (argued), Hughes, Kellner, Sullivan & Alke, Helena, Montana
               (Qwest Corporation and Montana-Dakota Utilities Company)

               Larry M. Elison, Matthew Clifford, Attorneys at Law, Gold Canyon, Arizona

               Orally Argued and Submitted:  January 16, 2003
                            Decided:  December 18, 2003

Filed:        _____, Clerk

District Judge Edward P. McLean delivered the Opinion of the Court.

¶1 The Appellant media entities (hereinafter "the media") appeal from the Memorandum and Order of the First Judicial District Court, Lewis and Clark County, granting the media partial relief by concluding that certain documents filed by the Montana Power Company ("MPC") with the Montana Public Service Commission ("PSC") should be disclosed to the public, but denying the media access to certain other documents filed by MPC with the PSC under the PSC's Protective Order. After due consideration, this matter is reversed and remanded for further proceedings consistent with this Opinion.

¶2 We restate the issues on appeal as follows:

¶3 1. Whether the District Court erred by failing to correctly balance the public's constitutional right of access to documents filed by the MPC with the PSC against the MPC's constitutional right of privacy.

¶4 2. Whether the media was required to exhaust its administrative remedies before filing an action in the District Court.

¶5 3. Whether the PSC's procedural rules unconstitutionally shift the burden of proof to the public, thus creating an impermissible presumption of confidentiality.

¶6 4. Whether the District Court's interpretation and application of the statutory definition of "trade secret" was correct.

¶7 5. Whether the District Court's conclusions were correct regarding the confidentiality of the documents which the court found were constitutionally protected from public

2

disclosure.

## BACKGROUND

¶8     The Montana Power Company, now known as Northwestern Energy, LLC, is the electric distribution services provider for the western two-thirds of the state of Montana. As such, the MPC is required by Rule 38.5.6007, ARM, and by statute at § 69-8-210(3), MCA, to act as the default supplier for that service territory.

¶9     On October 29, 2001, MPC filed its default supply portfolio docket with Montana's PSC, seeking PSC approval of its portfolio docket for the fiscal year beginning July 1, 2002. MPC's portfolio docket consisted of a package of long-term, mid-term and spot market purchases. Filing with the PSC is statutorily required of public utility companies under Title 69, Montana Code Annotated, to enable the PSC to determine whether the costs of MPC's default supply portfolio have been "prudently incurred" and should be "fully recoverable in rates." Section 69-8-210(4)(a), MCA.

¶10     Before filing the required portfolio docket with the PSC, MPC made a motion to the PSC for a protective order to prevent public disclosure of parts of MPC's supply purchase contracts with third party suppliers, some of which are subject to confidentiality provisions. MPC represented to the PSC that the information for which MPC was seeking a protective order contained constitutionally protected trade secrets and confidential proprietary information that have economic value to MPC and/or its default supply customers, bidders and contract holders by virtue of their confidentiality. MPC also requested the PSC

3

protective order be drafted broadly enough to cover any other confidential information that may be requested during the review process to avoid any procedural delays in obtaining more protective orders during the process.

¶11 The PSC issued the requested protective order. The MPC filed the default supply contracts under the protection of the Order and provided redacted versions of the contracts to the public. Other documents have since been filed under the PSC Protective Order in response to data requests made during the PSC filing and review process.

¶12 On November 2, 2001, Mike Dennison, a reporter with Petitioner *Great Falls Tribune*, sought to examine certain documents and information deemed confidential by MPC which MPC had submitted to the PSC for approval. Mr. Dennison was informed by the PSC that the documents he sought were subject to the PSC Protective Order but that he could challenge MPC's claims of confidentiality by filing a motion with the PSC in accordance with Rule 38.2.5008, ARM.

¶13 Rather than filing such motion with the PSC, the *Great Falls Tribune*, along with the other named media entities, filed an action with the Montana First Judicial District Court, Lewis and Clark County, seeking disclosure of information from purchase and sale agreements contained in MPC's portfolio docket regarding certain electricity contractors, suppliers, projects and other information purporting to fall within the parameters of the PSC Protective Order. Other information sought by the media included documents such as exhibits, charts, tables, calculations, work papers, studies and bid information which were

4

provided to the PSC in response to data requests from the PSC, the Montana Consumer Counsel and other interested parties involved with the review and approval process of MPC's default portfolio docket. By Memorandum and Order entered March 1, 2002, the District Court denied the motions of the PSC and MPC to dismiss the court action based on the District Court's conclusion that the PSC failed to properly apply the Montana Constitution, Article II, Section 9 constitutional balancing test set forth in *Mt. States, Etc. v. Dept. of Pub. Serv. Reg.* (1981), 194 Mont. 277, 284-86, 634 P.2d 181, 186-87, to determine whether individual documents are constitutionally protected from public disclosure under Montana's "individual privacy" provision, and that only the courts have jurisdiction to rule on constitutional issues.

¶14 Following a three-day evidentiary court hearing on the merits on March 20, 21, and 22, 2002, the District Court issued a Memorandum and Order dated April 29, 2002, wherein the District Court ruled on the confidentiality of several categories of documents located in MPC's portfolio docket. While doing so, the court acknowledged the existence of the constitutional balancing test set forth in *Mt. States* for determining whether documents are constitutionally protected from public disclosure under the right of privacy provision. However, the court noted that the MPC did not argue before the court that the documents were protected under the *Mt. States* constitutional balancing test as "privacy rights." Rather, the MPC argued that the information was comprised of "property rights" protected by

5

constitutional "due process."[1]

¶15    The media appealed to this Court, alleging that the District Court (1) failed to apply the Article II, Section 9 constitutional balancing test to each challenged document; (2) adopted a presumption of privacy which unconstitutionally shifted the burden of proof from MPC to the public; and (3) adopted an excessively broad definition of "trade secret" in evaluating whether documents filed by MPC were constitutionally protected from public disclosure.

¶16    In response, MPC represents that the District Court heard the evidence, reviewed each challenged document, and correctly applied the constitutional balancing test to each document before categorizing the documents for purposes of efficiently summarizing the court's analyses in its written decision.

¶17    In addition to the briefs filed by the PSC and MPC in this appeal, amicus briefs have been filed jointly by Qwest Corporation and Montana-Dakota Utilities Company, both of whom are utility companies which are regulated by the PSC, and by University of Montana Constitutional Law Professor Emeritus, Larry Elison.

STANDARD OF REVIEW

¶18    Under the current posture of this case, there are no material questions of fact which

---

[1] MPC's initial briefs before the District Court relied solely on the *Mt. States* privacy theory. However, at trial and in post-trial briefing, MPC abandoned its privacy theory and asserted constitutional due process grounds to protect its property rights in its and its suppliers' trade secrets.

6

must be determined before this Court entertains the media's constitutional challenges. Therefore, we review the District Court's conclusions of law to determine whether they are correct. *Brady v. Montana Dept. of Justice*, 1999 MT 153, ¶ 6, 295 Mont. 75, ¶ 6, 983 P.2d 292, ¶ 6.

DISCUSSION

ISSUE ONE

¶19 Whether the District Court erred by failing to correctly balance the public's constitutional right of access to documents filed by MPC with the PSC against MPC's constitutional right of privacy.

¶20 The Article II, Section 9 constitutional balancing test is founded on this Court's legal conclusion in the *Mt. States* case that a business entity's trade secrets and confidential proprietary information are constitutionally protected from public disclosure under the "right of privacy" provision of the Montana Constitution, which provides:

> No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of *individual privacy* clearly exceeds the merits of public disclosure.

Art. II, Sec. 9, Mont. Const. (emphasis added).

¶21 In assuming in *Mt. States* that the framers of Article II, Sections 9 and 10 surely intended non-human entities to have the same constitutional rights to privacy as do human individuals to avoid equal protection problems under both the state and federal constitutions,

7

this Court failed to engage in any meaningful language construction analysis or review of the Constitutional Convention history to determine whether the word "individual" could reasonably be interpreted to include non-human entities such as corporations. *Mt. States*, 194 Mont. 277; 634 P.2d 181; *Associated Press, Inc. v. Department*, 2000 MT 160, 300 Mont. 233, 4 P.3d 5.

¶22 While the United States Supreme Court has determined that the individual's right of privacy is implicitly contained in the Bill of Rights to the United States Constitution, the right of individual privacy is expressly provided in Montana's Constitution which reads:

> The right of *individual* privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Art. II, Sec. 10, Mont. Const. (emphasis added).

¶23 While the 1972 Montana Constitutional Convention delegates elevated the people's right of privacy to a state constitutional right which exceeds the boundaries of the federal right of privacy under the United States Constitution, the majority of states still follow the common law right of privacy or have codified the right of privacy by adopting statutory privacy rights laws.[2]

---

[2] *See generally* Andrea G. Nadel, *What Constitutes Personal Matters Exempt From Disclosure by Invasion of Privacy Exemption Under State Freedom of Information Act*, 26 A.L.R. 4th 666; Andrea G. Nadel, *What Constitutes "Trade Secrets" Exempt From Disclosure Under State Freedom of Information Act*, 27 A.L.R. 4th 773; Lawrence Kaplan, *What Constitutes "Trade Secrets and Commercial or Financial Information Obtained From Person and Privileged or Confidential," Exempt From Disclosure Under Freedom of Information Act (5 USCS § 552(b)(4)) (FOIA)*, 139 A.L.R. Fed. 225.

¶24    Law Professor Larry Elison appeared in this case by amicus brief to urge this Court to revisit the issue of whether non-human entities were intended by the State Constitution's framers to have constitutional protection under the "right of privacy" exception to the "public's right to know" provision at Article II, Section 9.  Professor Elison submits that this Court erred in the *Mt. States* and *Associated Press, Inc.,* cases by treating business property interests of non-human entities, such as corporations, as constitutionally protected by the right of privacy provision, as evidenced by the Montana Constitutional Convention transcripts, which expressly reflect the framers' intent that the "individual privacy" exception in Article II, Section 9 applies only to human individuals, and that non-human business entities have no such constitutional claim to right of privacy under Article II, Section 9.  *See also* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1669-80 (referring to the delegates' discussion of "individual" or human privacy in connection with Article II, Section 10).

¶25    Furthermore, Professor Elison points out that under the context of the State Constitution, which is in essence a binding written compact between the people of Montana and their government, there is no known rule of language construction upon which to conclude that the word "individual," as used in Sections 9 and 10 of Article II, can mean

9

anything other than natural human individuals.[3]

¶26    Rather, Professor Elison submits that trade secrets and other confidential proprietary interests of business entities are "property" interests protected under the Fifth Amendment to the Federal Constitution (private property takings by government without just compensation) and the Fourteenth Amendment to the Federal Constitution (due process and equal protection under the law).

¶27    Accordingly, Professor Elison urges this Court to overrule the *Mt. States* constitutional balancing test under Article II, Section 9 to the extent *Mt. States* and its progeny relied on balancing of the individual's "right of privacy" against the public's "right to know" when the claimant of the right of privacy is other than a human individual.

¶28    The media counters Professor Elison's position by proposing that this Court has already implicitly overruled *Mt. States* in *Associated Press, Inc.*, ¶¶ 50-52 (Nelson, J., specially concurring), and *Great Falls Tribune Co., Inc. v. Day*, 1998 MT 133, ¶¶ 16-21, 289 Mont. 155, ¶¶ 16-21, 959 P.2d 508, ¶¶ 16-21, to the extent that *Mt. States* found that a business entity such as a corporation has constitutional "privacy" rights which must be balanced against the public's constitutional "right to know" what its government is doing. However, the media does not concede that a business entity's trade secrets and confidential

---

[3]  *See generally* Larry M. Elison & Deborah E. Elison, *Comments on Government Censorship and Secrecy*, 55 MONT. L. REV. 175 (1994).

10

proprietary information have constitutional protection under any other state or federal constitutional provisions, including due process provisions, which would justify non-disclosure of the publicly-held documents at issue in this case.

¶29 The media argues that even if the proper question is constitutional due process protection of a non-human entity's property rights, as opposed to individual privacy rights, the public's "right to know" should be vitiated only if disclosure poses "clear and present danger" to the asserted property right as was applied by this Court in *State ex rel. Smith v. District Court* (1982), 201 Mont. 376, 654 P.2d 982.

¶30 In the *Smith* case, this Court held that despite the inclusion of the "individual privacy" language in Article II, Section 9, there are other constitutional rights that compete with the "public's right to know." In that case, the competing right was the right to a fair trial in a criminal action. In that context, we stated:

> Whether the basis for press and public's right of access be the First and Fourteenth Amendments to the United States Constitution or the "Right to Know" provision of the Montana Constitution, the guarantee is not absolute. It can be properly circumscribed when the right or interest against which it competes is weighty or compelling.

*Smith*, 201 Mont. at 383, 654 P.2d at 986.

¶31 This issue was recently addressed at length in a special concurrence by Justice James C. Nelson, concurred with by Justice W. William Leaphart, wherein Justice Nelson stated in relevant part:

> The *Mountain States* Court correctly asserted that the federal due process

11

rights of [the corporation] may very well have been at stake, in that the corporation was being deprived of its property – trade secrets – without due process. The Court could have and should have stopped there. We should have turned strictly to those provisions of the federal constitution and disposed of the case on that basis.

*Associated Press, Inc.*, ¶ 75 (Nelson, J., specially concurring).[4]

¶32   In further explanation of his position in the *Associated Press, Inc.,* case, Justice Nelson stated:

> The problem with this approach [in *Mt. States*] was that we did not need to find a conflict between the Fifth and Fourteenth Amendments and Article II, Section 9, to resolve the case on federal due process grounds. We needed only to recognize that the privacy right included in this latter section did not provide protection to non-human entities; but that, by virtue of the Federal Constitution's Article VI "Supremacy Clause," [the corporation's] trade secrets were, nevertheless, clearly protected under the federal constitution. We could have disposed of the case by simply remanding for entry of an appropriate protective order grounded in due process.

*Associated Press, Inc.,* ¶ 77 (Nelson, J., specially concurring).

¶33   Having decided to revisit the issue of whether the word "individual" used in Article II, Sections 9 and 10 of the Montana Constitution includes non-human entities, this Court has now determined that the special concurrence of Justice Nelson in *Associated Press, Inc.*, accurately reflects the purpose and intent of the framers to limit the Montana State constitutional protection of privacy to natural human individuals. *See Associated Press, Inc.*, ¶¶ 105-08 (Nelson, J., specially concurring); Montana Constitutional Convention, Verbatim

---

[4]  For in-depth discussion of the line of Montana cases following *Mt. States* applying the right of individual privacy to non-human entities, see Justice Nelson's special concurrence in *Associated Press, Inc.*, ¶¶ 71-102.

Transcript, March 7, 1972, pp. 1669-81. In that regard, the following dialogue on the issue

of the meaning of the term "individual" is recorded at page 1680 of the 1972 Constitutional

Convention Transcript, as follows:

> DELEGATE [GEORGE B.] HELIKER: Mr. Dahood, being an ignorant nonlawyer, what is an individual?
>
> DELEGATE [WADE JOSEPH] DAHOOD: What is an individual?
>
> DELEGATE HELIKER: Is it by any chance also a corporation?
>
> DELEGATE DAHOOD: A person can, of course, Dr. Heliker, as you well know, be defined to include a corporation under the law.
>
> DELEGATE HELIKER: I know a person can, but can an individual?
>
> DELEGATE DAHOOD: An individual, in my judgment, would not be a corporation, no.

¶34 This position is further represented in Delegate Dahood's statement in relevant part

to the State Constitutional Convention delegates that the right of privacy provision is not

enacted for the benefit of the press, but "for the benefit of the citizen of the State of

Montana." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p.

1673. Accordingly, Section 9 of Article II of the Montana Constitution, as ultimately

adopted by the 1972 Constitutional Convention, provides:

> No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of *individual privacy* clearly exceeds the merits of public disclosure.

Art. II, Sec. 9, Mont. Const. (emphasis added).

¶35 Immediately following the above cited dialogue between delegates Dr. Heliker and

13

Mr. Dahood, the Constitutional Convention delegates approved the use of the words "right of individual privacy" in Section 9 of Article II as an express exception to the public's right under the Montana Constitution to know what its government is doing. Consequently, to further define the scope of the constitutional right of privacy under the Montana Constitution, the delegates also inserted the word "individual" into Section 10 of Article II, which as adopted reads:

> The right of *individual privacy* is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Art. II, Sec. 10, Mont. Const. (emphasis added).

¶36 Accordingly, the Constitutional Convention Transcripts support Professor Elison's position that the state constitutional right of privacy is afforded only to natural human beings and not to non-human entities such as corporations. Professor Elison is likewise correct that there are no known rules of language construction which permitted this Court to summarily extend in the *Mt. States* case the constitutional right of privacy to non-human entities under the ordinary and unambiguous definition of "individual."

¶37 Consequently, this Court concludes that the special concurrence of Justice Nelson in the *Associated Press, Inc.,* case masterfully outlines the correct interpretation of Article II, Sections 9 and 10 that the "individual privacy" exception to the public's "right to know" is limited to natural human individuals only. *Associated Press, Inc.*, ¶¶ 71-102 (Nelson, J., specially concurring).

¶38 Accordingly, this Court hereby expressly overrules *Mt. States*, and its progeny, to the

14

extent the decisions rely on the Article II, Section 9 constitutional balancing test of the right of "individual privacy" against the public's right "to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions" as a basis for protecting trade secrets and other confidential proprietary information of non-human entities.

¶39    While non-human entities do not enjoy privacy rights under the right of privacy provision of the Montana Constitution, nothing in Article II, Section 9 requires disclosure of trade secrets and other confidential proprietary information where the data is protected from disclosure elsewhere in the federal or state constitutions or by statute.  For example, a non-human corporate entity may enjoy confidentiality of its property interests under Montana statutory law, such as the Uniform Trade Secrets Act, Title 30, Chapter 14, Part 4, or protection against the "taking" of private property for public use without just compensation under the federal and state constitutions.  Such cases implicate the due process and equal protection clauses of the state and federal constitutions and form the legal grounds through which non-human entities can seek protection of confidential information.

ISSUE TWO

¶40    Whether the media was required to exhaust its administrative remedies before filing an action in District Court.

¶41    The MPC and the PSC filed motions to dismiss the action before the District Court based primarily on the argument that the media failed to first file a motion before the PSC as required under the PSC's rules of administrative procedure for purposes of challenging

15

the MPC's claims of confidentiality.

¶42    In denying the MPC's and PSC's motions to dismiss, the District Court concluded that since the central issues raised by the media in the district court action involved constitutional challenges to relevant administrative regulations, statutes, and Montana case law, the PSC lacked jurisdiction to determine the issues raised before the District Court. The District Court proceeded to make factual and legal determinations regarding whether specific documents or certain categories of documents in MPC's portfolio constituted property rights in the form of trade secrets or other confidential proprietary information which are constitutionally protected. This was all done without the benefit of the administrative agency developing a record and making threshold determinations on these complex issues.

¶43    The difficulty with this approach is that it virtually eliminates the very purpose of the administrative agency. The founding purpose of state administrative agencies, such as the PSC, was due largely in part to place the initial decision-making into the hands of those who are most knowledgeable and qualified in the field to make those decisions. In the present case, the PSC presumably has the requisite expertise to examine documents filed before it by utility companies and determine if any of the documents contain constitutionally protected property rights in the form of trade secrets or confidential proprietary information. The district court may then review the record of the agency proceedings, including its disposition of the issues, and determine whether the agency correctly decided the important legal issues, including matters such as property rights and trade secrets.

¶44    Since the media filed this action directly in the District Court, thus by-passing the

16

PSC, we conclude this matter should be remanded to the PSC for consideration of its arguments. In doing so, however, we note that the PSC must review its administrative rules for purposes of challenging confidentiality, since they appear to be primarily concerned with competitor utilities seeking information. Some of the rules may not apply to the media, such as Rules 38.2.5027and .5028, ARM, requiring interested parties to sign a nondisclosure statement.

## ISSUE THREE

¶45    Whether the PSC's procedural rules unconstitutionally shift the burden of proof to the public, thus creating an impermissible presumption of confidentiality.

¶46    At the same time the court action was proceeding in the District Court, PSC challenged, *sua sponte*, MPC's claims of confidentiality of documents pursuant to Rule 38.2.5008(3), ARM. In doing so, the PSC expressly declined to address whether any of the documents at issue in MPC's portfolio docket were protected from public disclosure pursuant to the constitutional right of privacy clauses under Article II, Sections 9 and 10 of the Montana Constitution. Rather, the PSC's decision was expressly limited to the issue of whether the information for which the MPC sought protection constituted "trade secrets" which are protected under constitutional "due process" analysis.

¶47    In response to PSC's *sua sponte* challenge of MPC's claims of confidentiality on due process grounds, the MPC filed with the PSC its arguments and evidence supporting the trade secret status of the information. The media responded with a short statement addressed to the PSC indicating its position that MPC's information did not qualify as constitutionally

17

protected trade secrets, but offered neither argument nor evidence before the PSC to support its position. Consequently, the PSC issued a written Order on Providers' Claims of Confidentiality on March 21, 2002, which: (1) evaluated MPC's claims of confidentiality against basic trade secret law; (2) found that MPC had the initial burden of establishing trade secrets and had met that burden; and (3) concluded that, no other evidence or argument having been presented by the media, the information was determined by the PSC to constitute trade secrets entitled to constitutional protection as a matter of law. *Mont. Power Co.*, Approval of the Default Supply Portfolio and the Projected Electric Cost Tracking for the 12-Month Period Beginning July 1, 2002, Docket No. D2001.10.144, Order No. 6382b (Mont. Pub. Serv. Comm'n Mar. 21, 2002).

¶48 In the very same time period that the PSC was *sua sponte* reviewing MPC's claims to the right of confidentiality, the District Court was engaged in its own extensive three-day evidentiary hearing to determine whether individual documents filed by MPC with the PSC constituted trade secrets or other proprietary interests which warranted constitutional protection from public disclosure.

¶49 In connection with defending against the PSC's and MPC's motions to dismiss the District Court action based on the media's failure to first exhaust their administrative remedies, the media challenged PSC's procedural rules as unconstitutionally placing the burden of challenging a public utility's claims of document confidentiality onto members of the public, thus creating an impermissible presumption of confidentiality.

¶50 MPC had requested that the initial PSC protective order in this case be drafted broadly

18

enough to cover any other confidential information that may be requested during the review process, to avoid procedural delay in obtaining more protective orders, as allowed under Rule 38.2.5004, ARM, which provides:

> Generic Protective Orders   (1) The commission, in its discretion, on the motion of a provider, may issue a "generic protective order," which is a protective order applicable to specified information or general categories of information expected to be supplied by a provider in certain specified or general categories of proceedings, compliance with reporting requirements, response to certain inquires, or other matters, for a period of time (e.g., term of years) rather than by specific proceeding.  The generic protective order and these rules govern access to confidential information provided under the generic protective order.

This practice is anticipated and encouraged by PSC regulations if the provider has reason to believe that confidential information will be submitted or is likely to be requested during the approval process.  To that end, Rule 38.2.5007(6), ARM, provides:

> In the interests of preventing delays in proceedings, the commission encourages providers to make requests for protection of confidential information at the earliest possible time in a proceeding, including in anticipation of a proceeding, if the provider has reason to believe that confidential information will be submitted or is likely to be requested in the proceedings.

¶51     The media argues that these regulations abrogate the PSC's affirmative duty to confirm MPC's claims of confidentiality of the information at the time of filing by allowing MPC to merely represent to the PSC that all documents it seeks to file under the protection of a generic protective order constitute protected trade secrets and other confidential proprietary information, and that in doing so, the PSC's regulations have created an unconstitutional presumption of confidentiality.  We agree.

19

¶52     In addressing that very issue before the 1972 Constitutional Convention, Delegate Dorothy Eck acknowledged the increasing concern of citizens and commentators alike that government's sheer bigness threatens the effective exercise of citizenship, by stating in relevant part:

> The committee notes this concern and believes that one step which can be taken to change this situation is to *constitutionally presume the openness of government documents and operations*. [Section 9 of Article II] stipulates that persons have the right to examine governmental documents and the deliberation of all public bodies or agencies, except to the extent that the demands of individual privacy clearly outweigh the needs of the public right of disclosure. The provision applies to state government and its subdivisions. The committee intends by this provision that the deliberations and resolution of all public matters must be subject to public scrutiny. It is urged that this is especially the case in a democratic society wherein the resolution of increasingly complex questions leads to the establishment of a complex and bureaucratic system of administrative agencies. The test of a democratic society is to establish full citizen access in the face of this challenge.

Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1670 (emphasis added).

¶53     Moreover, Section 8 of Article II provides:

> The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law.

¶54     In effect, Article II, Sections 8 and 9, of the 1972 Montana Constitution impose an "affirmative" duty on government officials to make all of their records and proceedings available to public scrutiny. Consequently,

> there is a *constitutional presumption* that all documents of every kind in the hands of public officials are amenable to inspection, regardless of legislation, special exceptions made to accommodate the exercise of constitutional police

20

power, and other competing constitutional interests, such as due process.

*Associated Press, Inc.*, ¶ 85 (Nelson, J., specially concurring) (quoting *Belth v. Bennett* (1987), 227 Mont. 341, 344, 740 P.2d 638, 640) (emphasis added). Leaving to the public the duty to initiate the challenge of confidentiality of particular documents filed by MPC with the PSC under a "generic" protective order abrogates the PSC's affirmative duty to make all of its records available to the public in the absence of *specific findings by the PSC* that the documents represented by MPC to constitute trade secrets or confidential proprietary information are indeed property interests which require constitutional due process protections.

¶55 Consequently, to the extent the PSC's current procedural rules and/or common practices rely on mere representations of public utilities that the information contains trade secrets or other confidential proprietary information which warrants protection of a PSC order and/or application of other protective measures, the PSC has unconstitutionally shifted the initial burden of proof to the public to challenge a public utility's claims of confidentiality. Thus, this creates a presumption of confidentiality which directly conflicts with the constitutional presumption of the public's right to view all public records and of the PSC's correlating constitutional affirmative duty to make its records and proceedings readily available to the public in the first instance.

¶56 Accordingly, this Court hereby rules that a non-human entity seeking protective orders or other protective measures for materials filed with a regulating governmental agency, such as the PSC, must support its claim of confidentiality by filing a supporting affidavit making

21

a prima facie showing that the materials constitute property rights which are protected under constitutional due process requirements. The claimant's showing must be more than conclusory. It must be specific enough for the PSC, any objecting parties, and reviewing authorities to clearly understand the nature and basis of the public utility's claims to the right of confidentiality. To the extent that the PSC's current procedural rules require less, this Court directs their amendment to comport with its holding herein.

¶57 Furthermore, this Court hereby rules that the governmental agency has the affirmative duty to review at the time of filing of the alleged confidential records of a non-human entity, and the hereinafter required supporting affidavits, and make an independent determination whether the records are in fact property rights which warrant due process protection under the applicable state or federal law.

ISSUE FOUR

¶58 Whether the District Court's interpretation and application of the statutory definition of "trade secret" was correct.

¶59 At the outset, the ultimate inquiry by the agency or the district court is whether the utility has a demonstrable property right in the information sought to be kept confidential and whether the disclosure of that information would, therefore, require compensation if there is a "taking" in the constitutional sense. Certainly a trade secret is one form of information in which there is a statutorily defined property right. Here, the District Court analyzed the documents presented and made various determinations of whether the documents were in fact trade secrets entitled to protection or whether the documents were of a public nature and

22

accessible to the media. The media is critical of the District Court's interpretation of trade secrets and argues that it treated economic advantage as the determining factor without giving due consideration of whether the information was "uniquely creative."

¶60 As a starting point, when determining whether certain information constitutes a trade secret, the agency or the district court will necessarily determine whether private documents filed with a governmental agency are subject to the public's constitutional "right to know," pursuant to Article II, Section 9. As stated above, documents filed by corporate entities with public agencies, such as the PSC, are presumptively available for access by the public under Montana's Constitution. The burden rests with the filing entity to establish prima facie proof that the information is a discernible property right entitled to protection. When the state of Montana obtains access to private property in the form of genuine trade secrets or other confidential proprietary information by compelling its production for filing with a governmental regulatory agency, such as the PSC, the information's status as a trade secret or confidential proprietary information remains unchanged.

¶61 In cases where a claimant seeks statutory protection from public disclosure under Montana's Uniform Trade Secrets Act, the claimant's efforts to maintain the information's secrecy must be "reasonable under the circumstances." Section 30-14-402(4)(b), MCA. What is reasonable under the circumstances should be entirely different in the context of a utility filing contracts with an agency, such as the PSC, as compared to an exchange of information between private parties. In other words, one might expect a more encompassing definition of a trade secret in litigation between private parties than would be recognized

23

when a utility files a document with the PSC. Certainly the fact that the contracts, although private, were negotiated for the benefit of the public must be taken into consideration.

¶62    If after considering all of the circumstances, the information is determined by a governmental agency or reviewing authority to qualify as a property right in the form of a "trade secret" which warrants due process protections, secrecy can be preserved by the agency through:

> *reasonable means*, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

Section 30-14-406, MCA (emphasis added). While this particular statute is applicable to court actions involving claims of wrongful appropriation of trade secrets under Montana's Uniform Trade Secrets Act by non-governmental entities, the same or similarly reasonable means are useful and available to the PSC in protecting property rights comprised of trade secrets in the process of fulfilling its regulatory duties over public service providers.

¶63    Consistent with our conclusion that the administrative process must be exhausted, the determination of what is or is not a protected property interest must be first addressed by the PSC in accordance with Section 30-14-402(4)(b), MCA, and supporting case law.

ISSUE FIVE

¶64    Whether the District Court's conclusions were correct regarding the confidentiality of the documents which the court found were constitutionally protected from public disclosure.

¶65    In light of our decision, we reverse the District Court's conclusions regarding the

24

confidentiality of the documents and remand to the District Court for proceedings consistent with this Opinion. That is, assuming the media wishes to still pursue this matter and the issues remain justiciable, the District Court shall, in turn, remand this matter to the PSC for determination of whether the documents in question must be disclosed or may be kept confidential as a trade secret or other property right entitled to protection. Proceedings on remand shall take into consideration the procedural concerns set forth in this Opinion, specifically those concerns set forth under our discussion in Issues III and IV.

¶66    Reversed and remanded for further proceedings consistent with this Opinion.


/S/ ED P. McLEAN
Hon. District Judge Edward P. McLean sitting for
former Justice Terry N. Trieweiler


We Concur:

/S/ JIM REGNIER
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ DIANE G. BARZ
Hon. District Judge Diane G. Barz sitting for
Chief Justice Karla M. Gray

Justice James C. Nelson specially concurs.

¶67    I concur in our Opinion but write separately to express my concerns on two aspects of our decision--namely, the "affidavit" procedure and our focus on "trade secrets."

¶68    Following the enactment of the federal Bill of Rights, James Madison wrote: "popular government without popular information or the means of acquiring it, is but a prologue to a farce or a tragedy or perhaps both." James Madison, *Writings of James Madison*, 103 (Gaillard Hunt ed. 1910). In Montana, the public's fundamental constitutional right to know, Article II, Section 9, was drafted and adopted to guarantee that the people would be able to realize what Madison observed was so important to an effective democracy--the ability of the people to acquire popular information about their government and institutions.

¶69    Before 1997, utilities were highly regulated. These utilities were kept on a short leash by the PSC, and the public justifiably could rest comfortable in the knowledge that its interests were being protected by an agency with the horsepower to make sure that Montana's utility/monopolies were being managed and operated in a cost effective manner for the benefit of the public and with a fair return to shareholders.

¶70    For the most part, all that ended in 1997 with deregulation. *See* Title 69, Chapter 8, Montana Code Annotated. Since that debacle, the public has been treated to year after year of mismanagement, failures, run away greed and bankruptcies in some of Montana's premier utilities. Worse, because of deregulation, these failures along with the obscene salaries, bonuses and perks, the trophy homes and the platinum parachutes of senior management have been and are being effectively subsidized by workers who have lost their jobs, benefits

26

and pensions; by shareholders who have lost their investments; and by rate payers whose enjoyment of cheap power has been replaced by some of the most expensive power in the northwest.

¶71   If the public is to have any ability to know and understand how its government is exercising its remaining control over the utilities, then individuals and organizations must have access to information that is filed by these utilities with government agencies, including the PSC.  Our Opinion recognizes this reality.

¶72   However, I suggest that we must recognize another reality.  Workers, shareholders, rate payers, and members of the public individually, are not likely to have the wherewithal to effectively exercise their constitutional right to know in connection with filings and proceedings before the PSC.  Though they have the right to do so, few people struggling to make a living and support their families have the time and the resources to comb through volumes of data and documents filed with the PSC and to fight with the utilities over what is confidential and what is not.  Much less do these Montanans have the expertise to understand how this information may affect their lives and finances.

¶73   For these reasons, I submit that the public's right to know and another fundamental constitutional right--freedom of the press--are inextricably intertwined in cases such as this.  Our Opinion discusses the right to know, Article II, Section 9, of the Montana Constitution.  Freedom of the press is guaranteed under Article II, Section 7.  This Section provides, in pertinent part:

**Freedom of speech, expression, and press**.  No law shall be passed

27

impairing the freedom of speech or expression. Every person shall be free to speak or publish whatever he will on any subject, being responsible for all abuse of that liberty.

¶74    I suggest that where, as a practical matter, members of the public may not have the capability to effectively exercise their right to know, the press and the media do have the time and resources to monitor proceedings before the PSC and to ferret out, analyze and publish information that will educate the public. Put another way, in exercising its own right to know, the media, can, via the right of freedom of the press, exercise the public's right to know on its behalf as well. *See Associated Press, Inc. v. Department*, 2000 MT 160, ¶¶ 117-19, 300 Mont. 233, ¶¶ 117-19, 4 P.3d 5, ¶¶ 117-19 (Nelson, J. concurring).

¶75    To effectively exercise these rights, however, the press and media must have access to all of the documents and data filed by utilities with the PSC. And, this brings me to my concern with the "affidavit" procedure outlined at ¶ 56 of our Opinion.

¶76    Any competent lawyer is capable of crafting an affidavit that will render confidential or proprietary nearly any information that the utilities choose not to disclose. To be sure, our Opinion requires specificity in the showing to be made in the affidavit. The fact remains, however, that specificity is a relative term; and the PSC's subjective judgment about the adequacy of the affidavit will ultimately be imposed on objectors--and the media--without any concomitant ability on the part of those persons and organizations to challenge the affidavit on the basis of having access to the original underlying data and documents themselves.

¶77    While we have clearly stated that the constitutional presumption is that information

28

filed with the PSC is not confidential and that government operations and documents should be open, I fear that the prevalent culture of corporate and governmental secrecy will ultimately result in a balance where the utilities' rights to due process and ownership of property carry far greater weight than the publics' right to know and the media's right to publish. In short, I suggest that our confidence in the "affidavit procedure" is likely the triumph of hope over experience. And, I will be surprised if this procedure provides any meaningful protection or remedy for those who would attack utilities' claims of confidentiality. I believe that with some innovative and original thought, the PSC and counsel for the utilities, objectors and the media, could devise a procedure that would give the utilities temporary protection from disclosure and the objectors and media access to the original data, pending a final decision on judicial review as to what information must be kept from the public and that to which the public has the right to know.

¶78 My second concern is our focus on "trade secrets." Throughout the Opinion, the Court refers to trade secrets and other "confidential proprietary information." Yet, in addressing Issue 4, the possibility that the information at issue here is not a trade secret at all, but some other type of confidential proprietary information, is not explicitly acknowledged. While the Opinion acknowledges at ¶ 61 that the protection afforded a trade secret may vary depending on the circumstances, e.g., public vs. private, the Opinion also implies at ¶ 62 that application of Montana's Uniform Trade Secret Act is appropriate here. Given that the information at issue here is contract terms between two or more parties, rather than a trade secret held by one entity from its competitors, I would hesitate to direct the PSC

or the District Court to look only to the Trade Secrets Act on remand.

¶79    A trade secret is defined under Montana law as follows:

> "Trade secret" means information or computer software, including a formula, pattern, compilation, program, device, method, technique, or process, that;
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from it disclosure or use; and
> (b) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy.

Section 30-14-402(4), MCA.  The whole purpose of the Trade Secrets Act is to prevent and to punish "misappropriation."  *See generally* Title 30, Chapter 14, Part 4, Montana Code Annotated.

¶80    It is not clear from our Opinion how contract information of the sort at issue here, qualifies as a trade secret under this definition nor is it apparent how the public can "misappropriate" information that must be filed with the government and that is constitutionally presumed not to be confidential.  I am not aware of any claim in this litigation that the media is attempting to "misappropriate" the utility's information.  Indeed, the media is simply trying to gain access to information that is presumptively not confidential and that the public has a right to know.

¶81    That is not to say, however, that a utility may not have a protectable property right in its contracts.  "Confidential business information has long been recognized as property." *Carpenter v. United States* (1987), 484 U.S. 19, 26, 108 S.Ct. 316, 320, 98 L.Ed.2d 275.  In addition, "confidential information acquired or compiled by a corporation in the course and

30

conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy." *Carpenter*, 484 U.S. at 26, 108 S.Ct. at 320 (citation omitted). Further, as the United States Supreme Court noted in *Lynch v. United States* (1934), 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, valid contracts are "property," which cannot be taken without just compensation, whether obligor be private individual, municipality, state, or United States. *Lynch*, 292 U.S. at 579, 54 S.Ct. at 843.

¶82    But if disclosure of such information is required, the first question is to determine what type of information it is, in order to determine the type of protections to which it is entitled.    Further, if the information is protected but nevertheless revealed by the government, the next question is not one of misappropriation, but rather, whether the utility has suffered some type of compensable damages or whether there has been a "taking" in the constitutional sense of the utility's property for which the utility must be justly compensated under Article II, Section 29, of the Constitution.    Moreover, and while an extensive discussion of takings jurisprudence is beyond the scope of this Opinion, it is important to acknowledge that not every taking is compensable. *See for example and compare Penn Central Transp. Co. v. New York City* (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631; *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798; and *Pruneyard Shopping Center et al. v. Robins* (1980), 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741.

¶83    Tying the information at issue here to being a trade secret is a mistake in my view.

This approach is, at one and the same time, over broad (in that the definition of trade secret is being expanded to include contract rights and information not encompassed within the statutory definition), and under inclusive (in that the utility may have a property right in information and contracts that are not trade secrets).

¶84     With the above caveats, I concur in our Opinion.


                                            /S/ JAMES C. NELSON