No. 05-290

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 262

_____

IN THE MATTER OF T.L.S.,

        Respondent and Respondent,

   v.

MONTANA ADVOCACY PROGRAM,

        Intervenor and Appellant.

_____

APPEAL FROM:    District Court of the Fourth Judicial District,
                    In and for the County of Missoula, Cause No. DI-92-1834,
                    The Honorable John W. Larson, Presiding Judge.

COUNSEL OF RECORD:

        For Appellant:

                Beth Brenneman, Montana Advocacy Program, Helena, Montana

        For Respondent State of Montana:

                Leslie Halligan, Missoula County Attorney's Office, Missoula, Montana

        For Respondent T.L.S.:

                Margaret L. Borg, Public Defender's Officer, Missoula, Montana

        For Amicus Curiae:

                Andrew I. Huff, American Civil Liberties Union of Montana Foundation, Helena, Montana

                               _____

                               Argued and Submitted:  June 14, 2006
                                    Decided:  October 10, 2006

Filed:

          _____
                             Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 The Montana Advocacy Program (MAP) appeals from the order of the Fourth Judicial District Court, Missoula County, denying its motion for leave to release documents from a sealed court file. We reverse and remand with instructions.

## BACKGROUND

¶2 In September of 1992, the State of Montana (State) commenced involuntary commitment proceedings pursuant to Title 53, Chapter 20 of the Montana Code Annotated (MCA), alleging that T.L.S. was seriously developmentally disabled and in need of placement in a residential facility. The District Court ordered that T.L.S. be detained at the Montana Developmental Center (MDC) for evaluation and, subsequently, in July of 1993, ordered that T.L.S. be committed to the MDC for an extended course of treatment and habilitation for a period not to exceed one year. The State petitioned, and the District Court ordered, that T.L.S. be recommitted to the MDC each year thereafter through November of 2003. In October of 2003, as the last recommitment period was nearing expiration, the State again petitioned the District Court to recommit T.L.S. to the MDC.

¶3 Proceedings to recommit a developmentally disabled person—or "resident"—to a residential facility are governed by § 53-20-128, MCA. If the qualified mental retardation professional (QMRP) responsible for the resident's habilitation while in the facility determines that the resident continues to be seriously developmentally disabled and in need of commitment, the QMRP must request the State to file a petition for recommitment. Section 53-20-128(1), MCA. A person is "seriously developmentally disabled" when he or she

2

(a) has a developmental disability;

(b) is impaired in cognitive functioning; and

(c) has behaviors that pose an imminent risk of serious harm to self or others or self-help deficits so severe as to require total care or near total care and who, because of those behaviors or deficits, cannot be safely and effectively habilitated in community-based services.

Section 53-20-102(15), MCA (2003).

¶4 In October of 2003, the QMRP in charge of T.L.S.'s habilitation at the MDC prepared a recommitment report in which the QMRP specifically found that T.L.S. was not currently exhibiting behaviors which were a danger to others or to himself, and that his behaviors and needed level of care were not such he could not be safely and effectively habilitated in a community-based program. In other words, the QMRP determined that T.L.S. was no longer seriously developmentally disabled as defined by the statute. Notwithstanding this determination, the State's petition for recommitment in October of 2003 alleged that the QMRP had requested that the petition be filed, and that it was the QMRP's opinion that T.L.S. continued to be seriously developmentally disabled and in need of commitment.

¶5 After the State filed its petition, the District Court referred the matter to the residential facility screening team (RFST) in accordance with §§ 53-20-128(4) and -133, MCA. It is the RFST's responsibility to determine, upon receipt of a petition for commitment, "whether placement and habilitation in a residential facility are appropriate for the respondent." Section 53-20-133(1), MCA. A district court may not commit a person to a residential facility unless the RFST determines the person is seriously

3

developmentally disabled and that placement and habilitation in a residential facility is appropriate. Section 53-20-133(2) and (3), MCA.

¶6 The RFST issued its report in November of 2003. It determined that T.L.S. was no longer seriously developmentally disabled and recommended against recommitment to the MDC. The State then moved the District Court to adopt the RFST's recommendations. On November 19, 2003, the District Court entered its order approving and adopting the RFST's recommendations. However, the District Court entered another order on December 11, 2003, stating that the RFST had determined T.L.S. was seriously developmentally disabled and commitment to the MDC was appropriate, and ordering T.L.S.'s recommitment to the MDC for a period not exceeding one year. T.L.S.'s appointed public defender did not appear on his behalf during the 2003 recommitment proceedings. T.L.S. died on March 26, 2004, while residing at the MDC.

¶7 MAP is required by state and federal law to advocate for—and protect the rights of—disabled individuals in Montana, including those with developmental disabilities. Pursuant to these requirements, MAP investigates the death of any individual residing in a publicly funded institution such as the MDC. Accordingly, on March 31, 2004, MAP initiated an investigation of T.L.S.'s death, during which it reviewed the records pertaining to T.L.S. maintained by the MDC.

¶8 Based on the MDC's records, MAP became concerned that T.L.S.'s recommitment to the MDC in December of 2003 was contrary to law. MAP then moved the District Court to order its Clerk to provide MAP with copies of relevant documents from the court file concerning T.L.S.'s last recommitment. MAP served its motion on

4

both the State and T.L.S.'s appointed public defender. The District Court granted the motion the following day.

¶9 After reviewing the court documents, MAP drafted an investigative report identifying various legal inadequacies of T.L.S.'s 2003 recommitment. MAP intended to use its report to advocate for legislative, administrative and judicial reforms in the processes used to commit developmentally disabled individuals. MAP appended to the report selected legal documents from the 2003 recommitment proceeding, redacted to remove information which would identify T.L.S.

¶10 On July 29, 2004, MAP sent copies of the report to the District Court, the State and T.L.S.'s appointed counsel, inviting responses, comments or concerns by August 6, 2004. Recognizing that the appended documents were part of a sealed court record, MAP also informed the parties that,

> [p]rior to any distribution of the report outside of those individuals involved in the proceedings, we shall request that the district court grant MAP leave to distribute the legal documents relevant to the December 2003 involuntary recommitment with the report after they are redacted to preserve [T.L.S.'s] privacy.

No one responded to MAP regarding the report by the August 6, 2004, deadline. On August 12, 2004, however, the District Court *sua sponte* entered an order staying further distribution of MAP's report until September 7, 2004, and giving the State and T.L.S.'s counsel until September 3, 2004, in which to file responses to the report. On September 3, 2004, the State moved the District Court for an extension of time until September 13, 2004, in which to file its response.

¶11 On September 13, 2004, no responses having been filed, MAP moved the District Court for leave to release the redacted documents from the court file pertaining to the

recommitment proceeding initiated by the State in October of 2003. On September 16, 2004, the District Court granted the State's earlier motion for extension of time, giving the State until September 24, 2004, in which to respond to the report. Neither the State nor T.L.S.'s appointed counsel responded to MAP's report or its motion for leave to release documents. Consequently, on October 12, 2004, MAP requested the District Court to deem its motion for leave to release the documents well-taken, and grant the motion.

¶12 On November 15, 2004, the State moved the District Court to void a conflicting order. The motion recognized that the court's December 11, 2003, recommitment order conflicted with the court's November 19, 2003, order adopting the RFST's recommendation against recommitment, and requested the court to declare the December 11, 2003, recommitment order null and void. The District Court entered an order on February 2, 2005, addressing both the State's motion to declare the recommitment order null and void, and MAP's motion for leave to release the redacted court documents.

¶13 With regard to the State's motion, the District Court voided that portion of its December 11, 2003, recommitment order which determined T.L.S. was seriously developmentally disabled. It refused, however, to void its determination that T.L.S. should be recommitted. The District Court denied MAP's motion for leave to release the redacted court documents. MAP appeals that portion of the District Court's order denying its motion for leave to release the court documents.

## STANDARD OF REVIEW

¶14 MAP challenges various of the District Court's conclusions based on the court's interpretation and application of statutory and constitutional law. We review a district

6

court's conclusions of law to determine whether those conclusions are correct. *Great Falls Trib. v. Mont. Public Ser. Com.*, 2003 MT 359, ¶ 18, 319 Mont. 38, ¶ 18, 82 P.3d 876, ¶ 18.

## DISCUSSION

¶15 **Did the District Court err in denying MAP's motion for leave to release documents from a sealed court file?**

¶16 In its order denying MAP's motion for leave to release the court documents, the District Court observed that it had sealed the court record of T.L.S.'s involuntary commitments pursuant to § 53-21-103, MCA, which requires a showing of "good cause" before a court may open a record sealed thereunder. The court further observed that MAP had moved for leave to release the documents pursuant to Article II, Section 9 of the Montana Constitution—the "right to know" provision—which provides that

> [n]o person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

With regard to individual privacy, the court also observed that, pursuant to Article II, Section 10 of the Montana Constitution, "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Finally, the court noted that MAP's primary purpose for disseminating its report and the appended redacted court documents "is to outline recommendations for future reform of the involuntary commitment procedure in Montana . . . ."

¶17 Applying the above legal and factual observations, the District Court concluded that MAP's purpose in disseminating the report and redacted court documents did not

establish "good cause" under § 53-21-103, MCA, for the court to open the sealed record. The court further concluded that MAP's purported need to disclose the documents did not rise to the level of a compelling state interest which would allow infringement upon T.L.S.'s right to privacy and, consequently, the need for public disclosure did not outweigh T.L.S.'s individual privacy rights. As a result, the District Court denied MAP's motion for leave to release the documents. MAP asserts error as to the District Court's legal conclusions.

¶18 We first address the District Court's application of § 53-21-103, MCA, which provides in its entirety as follows:

> Records and papers in proceedings *under this part* shall be maintained separately by the clerks of the several courts. Five days prior to the release of a respondent or patient committed to a mental health facility, the facility shall notify the clerk of the court, and the clerk shall immediately seal the record in the case and omit the name of the respondent or patient from the index or indexes of cases in the court unless the court orders the record opened for good cause shown. [Emphasis added.]

By its terms, the statute applies only to proceedings brought under Title 53, Chapter 21, Part 1 of the MCA, which is entitled "Treatment of the Seriously Mentally Ill." The purpose of that Part is to provide for the care and treatment of persons with mental disorders. The term "mental disorder" is defined as "any organic, mental, or emotional impairment that has substantial adverse effects on an individual's cognitive or volitional functions" and expressly excludes mental retardation. Section 53-21-102(9), MCA.

¶19 In contrast, all of the commitment and recommitment proceedings involving T.L.S. were brought pursuant to Title 53, Chapter 20, Part 1 of the MCA, which governs the treatment and habilitation of developmentally disabled individuals. "Developmental disability" is defined, in part, as "a disability that is attributable to mental retardation,

8

cerebral palsy, epilepsy, autism, or any other neurologically disabling condition closely related to mental retardation and that requires treatment similar to that required by mentally retarded individuals." Section 53-20-102(5), MCA.

¶20 Consequently, § 53-21-103, MCA, by its terms, does not apply to the proceedings initiated to recommit T.L.S. to the MCD pursuant to Title 53, Chapter 20, Part 1 of the MCA. Nor do any statutes in Title 53, Chapter 20, Part 1 of the MCA—under which T.L.S. was committed and recommitted—contain any provision similar to § 53-21-103, MCA, relating to sealing and opening court records. Furthermore, while the part of the MCA governing treatment and habilitation of developmentally disabled individuals expressly incorporates by reference some provisions contained in Title 53, Chapter 21, Part 1 of the MCA, governing the mentally ill (*see, e.g.*, § 53-20-112(1), MCA), no statute in Title 53, Chapter 20, Part 1 expressly incorporates § 53-21-103, MCA.

¶21 For the reasons set forth above, we conclude that § 53-21-103, MCA, did not apply to the proceedings to recommit T.L.S. to the MDC brought pursuant to Title 53, Chapter 20, Part 1 of the MCA. Therefore, we further conclude the District Court erred in determining that MAP was required to establish "good cause" under § 53-21-103, MCA, before the court could order the record be opened.

¶22 We turn, then, to the District Court's application of Article II, Sections 9 and 10 of the Montana Constitution. That court determined MAP did not establish that the merits of public disclosure of the sealed court documents exceeded T.L.S.'s privacy interest in those documents.

¶23 As stated above, Article II, Section 9 of the Montana Constitution guarantees all persons the right to examine documents of all public bodies or agencies of the Montana

State government and its subdivisions except where "the demand of individual privacy clearly exceeds the merits of public disclosure." Applying Article II, Section 9 involves a three-step process. First, does the constitutional provision apply to the particular public body or political subdivision against whom enforcement of the provision is sought? Second, are the documents at issue documents of public bodies subject to public inspection? Third, if the first two requirements are met, is an individual privacy interest involved and, if so, does the demand of that individual privacy interest clearly exceed the merits of public disclosure? *Yellowstone County v. Billings Gazette*, 2006 MT 218, ¶ 18, 333 Mont. 390, ¶ 18, ___ P.3d ___, ¶ 18.

¶24 Here, the District Court determined—and the parties do not dispute—that the documents at issue were filed with the Clerk of the District Court—which is a county entity and, therefore, a subdivision of state government—and that filings with a clerk of court are subject to public inspection under the constitutional "right to know" provision. Consequently, the first two requirements of the Article II, Section 9 three-step process are met here.

¶25 The next step is to determine whether an individual privacy interest is at issue and, if so, whether that privacy interest clearly exceeds the merits of public disclosure of the documents. At this point in the analysis, the right to privacy guaranteed by Article II, Section 10 of the Montana Constitution comes into play and the competing interests of the "right to know" and the right to privacy must be balanced in light of the facts of each case. *Yellowstone County*, ¶¶ 19-20. The Article II, Section 10 right to privacy protects not only personal—or "autonomy"—privacy, but also "informational" privacy which

"extends to the details of a patient's medical and psychiatric history." *State v. Nelson*, 283 Mont. 231, 241, 941 P.2d 441, 448 (1997).

¶26 In evaluating whether a protected privacy interest exists under Article II, Section 10, courts generally must determine whether an individual has a subjective or actual expectation of privacy, and whether society is willing to recognize that expectation of privacy as reasonable. *See Yellowstone County*, ¶ 20. Again, the District Court determined in the present case—and the parties do not dispute—that T.L.S. had an actual and subjective expectation of privacy in the court documents relating to his involuntary commitment which society is willing to recognize as reasonable. Thus, we need only determine whether T.L.S.'s individual privacy interest clearly exceeds the merits of public disclosure of the court documents at issue.

¶27 At this point in its analysis, the District Court combined the language contained in Article II, Sections 9 and 10, and required MAP to establish a compelling state interest in releasing the sealed court documents sufficient to outweigh T.L.S.'s privacy interests in those documents. It then determined that MAP had not established such a compelling state interest and denied the motion for leave to release the documents. MAP contends the District Court erred in applying the "compelling state interest" language from Article II, Section 10 to the balancing test under Article II, Section 9, and in requiring MAP to establish that the merits of public disclosure outweigh T.L.S.'s privacy interests. We agree.

¶28 The Article II, Section 9 right of persons to examine documents of all public bodies and agencies of State government is guaranteed "except" where "the demand of individual privacy clearly exceeds the merits of public disclosure." In applying this

11

language, "[t]his Court has held that the only limit on the public's right to receive information is the constitutional right to privacy." *Montana Health Care v. Bd. Of Directors*, 256 Mont. 146, 150, 845 P.2d 113, 116 (1993). In other words, the constitutional right to examine documents of public bodies is presumed in the absence of a showing of individual privacy rights sufficient to override that right. Thus, once it is determined that requested documents are documents of public bodies subject to public inspection pursuant to Article II, Section 9, it is incumbent upon the party asserting individual privacy rights to establish that the privacy interests clearly exceed the merits of public disclosure. *See, e.g., Bozeman Daily Chronicle v. City of Bozeman*, 260 Mont. 218, 227, 859 P.2d 435, 441 (1993); *Worden v. Montana Bd. Of Pardons and Parole*, 1998 MT 168, ¶¶ 31-32, 289 Mont. 459, ¶¶ 31-32, 962 P.2d 1157, ¶¶ 31-32.

¶29    We conclude, therefore, that the District Court erred in requiring MAP to establish a compelling state interest warranting public disclosure of the sealed court documents under the third step of the Article II, Section 9 analysis outlined above. Rather, the question is whether T.L.S.'s individual privacy rights clearly exceed the merits of public disclosure of the documents under the circumstances of this case.

¶30    MAP contends—as it did in the District Court—that the merits of public disclosure of the sealed court documents are substantial in light of the need to inform the public regarding the actions of the public officials and employees involved in T.L.S.'s recommitment proceedings, and to effectively advocate for legislative, administrative and judicial reforms for the protection of developmentally disabled persons subject to such commitment proceedings. MAP also reasserts here its position in the District Court that, while T.L.S. does have a reasonable expectation of privacy in the documents, his privacy

12

right is lessened in this instance because MAP has redacted those documents to eliminate private information about T.L.S., including his name, the names of professionals involved in his care and habilitation at the MDC, and other identifying information.

¶31 However, it is the party asserting individual privacy rights which carries the burden of establishing that those privacy rights clearly exceed the merits of public disclosure. *See Bozeman Daily Chronicle,* 260 Mont. at 227, 859 P.2d at 441; *Worden*, ¶¶ 31-32. On appeal, the State and T.L.S.'s appointed counsel raise various arguments supporting their respective contentions that T.L.S.'s privacy rights clearly exceed the merits of disclosing the documents to the public and that MAP's redactions of those documents do not sufficiently protect T.L.S.'s privacy rights. As set forth above, neither the State nor T.L.S.'s appointed counsel responded to MAP's motion in the District Court for leave to release the documents after redaction. Consequently, their arguments here are raised for the first time on appeal. We do not address arguments raised for the first time on appeal. *See, e.g., In re Estate of Kindsfather*, 2005 MT 51, ¶ 34, 326 Mont. 192, ¶ 34, 108 P.3d 487, ¶ 34; *American Music Co. v. Higbee*, 2004 MT 349, ¶ 25, 324 Mont. 348, ¶ 25, 103 P.3d 518, ¶ 25.

¶32 We observe that MAP's arguments regarding the merits of disclosing the requested sealed court documents—as redacted—are strong. Furthermore, we have held that an individual's Article II, Section 10 privacy interest in public documents often can be protected by redacting names and other identifying characteristics from the documents, and thereby still allow disclosure of relevant public information under Article II, Section 9. *See, e.g., Worden*, ¶ 36. We conclude, therefore, that the redactions to the

documents at issue suggested by MAP sufficiently protect T.L.S.'s privacy interests such that those privacy interests do not clearly exceed the merits of public disclosure.

¶33    In summary, we conclude the District Court erred in requiring MAP to establish "good cause" under § 53-21-103, MCA, and a "compelling state interest" under Article II, Section 10 of the Montana Constitution in order to establish that the merits of disclosing the sealed court documents to the public outweighed T.L.S.'s privacy rights in those documents.  As a result, we hold that the District Court erred in denying MAP's motion for leave to release the sealed court documents.

¶34    Reversed and remanded with instructions that the District Court immediately vacate its order denying MAP's motion and enter an order releasing for public disclosure those sealed court documents requested, and as redacted, by MAP.

/S/ KARLA M. GRAY


We Concur:

/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ PATRICIA COTTER