# Hallowich v. Range Resources Corporation

*Robert N. Wilkey,* for plaintiffs.

*James C. Swetz* and *Richard W. Hosking,* for defendant Range Resources Corp.

*Kathy K. Condo-Caritis,* for defendant Williams Gas/Laurel Mountain Midstream.

*Erin Windle McDowell* and *Phillip J. Binotto,* for defendants Mark West Energy Partners, L.P. and Mark West Energy Group, L.L.C.

*Gail A. Myers,* for PA Department of Environmental Protection.

O'DELL-SENECA, *P.J.*, March 20, 2013—The matter before this court stems from an August 23, 2011 order that sealed the record in the underlying action from public view. Since that date, two newspapers, the *Pittsburgh Post-Gazette* and the *Observer-Reporter*, have sought to unseal that record. The PG Publishing Company filed a petition to intervene and motion to unseal record (September 6, 2011) and the Observer Publishing Company[1] filed a petition to intervene and joinder in said motion to unseal record (September 13, 2011). Range Resources Corporation; Williams Gas/Laurel Mountain Midstream; MarkWest Energy Partners, L.P.; and MarkWest Energy Group, L.L.C.[2] opposed those motions but did not carry their burden in that regard. All parties proceeded as if the petitions to intervene had been granted; thus, same are granted, and this opinion considers the motions to unseal record. An evidentiary hearing was set for January 18, 2013, where the parties called no witnesses. Neither the plaintiffs nor the defendant Pennsylvania Department of Environmental Protection (hereafter "the DEP") appeared at that hearing[3] or briefed this court on the press'

---

1. This opinion refers to the PG Publishing Company and Observer Publishing Company collectively as "the press".

2. This opinion refers to Range Resources Corporation; Williams Gas/Laurel Mountain Midstream; MarkWest Energy Partners, L.P.; and MarkWest Energy Group, L.L.C. collectively as "the defendants".

3. Earthjustice did appear minutes prior to that hearing, as it had filed a brief of *Amici Curiae* Philadelphia Physicians for Social Responsibility; Physicians, Scientists, and Engineers for Healthy Energy; Dr. Bernard D. Goldstein; Dr. Walter Tsou; Dr. Jerome A. Paulson; Dr. William Rom; Dr. Sandra Steingraber; Dr. Simona Perry; Dr. Robert Oswald; Dr. Michelle Bamberger; Kathryn Vennie; and Earthworks in Support of Proposed Intervenors on January 8, 2013 and a motion for leave to file *Amici Curiae* brief. Earthjustice, the Sierra Club's legal defense fund, is "a non-profit [*sic*] public [*sic*] interest law organization dedicated to protecting the magnificent places, natural resources, and wildlife of this earth." Earthjustice, "About Us" (available at: http://earthjustice.org/about, 2/20/13). Defendants opposed Earthjustice's Motion-initially claiming that the Pennsylvania Rules of Civil Procedure do not permit trial courts to accept *amici curiae* briefs. However, at oral arguments, they recanted, because no such rule of exclusion exists. Moreover, it

motions.

The August 23, 2011 order must be reversed per the common law. The defendants' assertions of a right of privacy under the Constitution of the Commonwealth of Pennsylvania are meritless, for the reasons stated below.

## Background

The Hallowiches initiated this action by praecipe to issue writ of summons against the defendants and the DEP on May 27, 2010. They immediately moved to stay the requirement to file a complaint and, also, for leave to conduct pre-complaint discovery. Their motion[4] was denied on November 17, 2010. The next document of record is the Hallowiches' July 11, 2011 praecipe for discontinuance. Hence, the parties settled[5] this matter

---

is settled law in this judicial district that acceptance of such a brief is within the trial judge's discretion, and it is appropriate whenever "a 'friend of the court' brief may be helpful in light of the...issues in the case *sub judice.*" *Washington School District v. Washington County*, September 7, 2011 petition and order (C.C.P. Washington 2008-607). This court ultimately denied Earthjustice's motion for leave to file *Amici Curiae* brief, because the parties' briefs sufficiently addressed the legal issues at bar and therefore rendered an additional brief from *amici curiae* unhelpful. Hence, the brief of *Amici Curiae*, though of record, remains unread.

4. That motion alleged, *inter alia*, that defendants failed:

to operate their gas [*sic*] drilling operations and gas [*sic*] processing facilities in such a manner as to not [*sic*] interfere with the Plaintiffs' enjoyment of their property rights and in such a manner as consistent with Pennsylvania environmental law [sic] which prohibits pollution of the air, waters [*sic*] and soil with harmful and [*sic*]/or toxic substances. The civil action further results from the department of environmental protection's failure and refusal to enforce Pennsylvania law against the aforementioned defendants and its affirmative violation of plaintiffs' civil rights, to be free from state-created danger.

Plaintiffs' motion to stay all rules to file complaint etc., 5/27/10, at 2.

5. The DEP did not enter into this settlement agreement and, given its lack of participation, has no further interest in this matter. Plaintiffs' petition for approval of settlement of minors' action pursuant to Pa.R.C.P. 2039 and local rule 2039.1, 7/28/11, at 2.

without the plaintiffs filing a complaint.[6]

Pursuant to Pennsylvania Rule of Civil Procedure 2039,[7]

---

6. The Hallowiches' counsel drafted a would-be complaint and made it a part of this court's record as exhibit A to plaintiffs' petition for approval of settlement of minors' action pursuant to Pa. R.C.P. 2039 and local rule 2039.1. That 41-page document, if served, would have added the Hallowiches' minor children as plaintiffs and Mt. Pleasant Township, its Board of Supervisors, its planning commission, and its zoning hearing board as defendants. Plaintiffs' petition for approval etc., 7/28/11, Ex. A at 1. The complaint alleged eleven counts against the various defendants arising from statutory violations and tort law. *Id.* at 16, 18, 19, 22, 23, 25, 28, 29, 31, 33, and 36. The plaintiffs would have prayed for a wide variety of relief at law and in equity, including, *inter alia,* compensatory and punitive damages, an injunction against drilling in and around their realty, and writs of mandamus to the DEP and Mt. Pleasant Township commanding them to regulate and police the defendants. *Id.* at 38-41.

7. Pennsylvania Rule of Civil Procedure 2039 provides:

(a) No action to which a minor is a party shall be compromised, settled or discontinued except after approval by the court pursuant to a petition presented by the guardian of the minor.

(b) When a compromise or settlement has been so approved by the court, or when a judgment has been entered upon a verdict or by agreement, the court, upon petition by the guardian or any party to the action, shall make an order approving or disapproving any agreement entered into by the guardian for the payment of counsel fees and other expenses out of the fund created by the compromise, settlement or judgment; or the court may make such order as it deems proper fixing counsel fees and other proper expenses. The balance of the fund shall be paid to a guardian of the estate of the minor qualified to receive the fund, if the minor has one or one is to be appointed. The balance of the fund payable to the guardian of the estate may include a structured settlement underwritten by a financially responsible entity that assumes responsibility for future payments or a trust as described in subdivision (b)(4) of this rule. If the minor has no such guardian and none is to be appointed, the court may order:

(1) an amount not more than twenty-five thousand dollars ($25,000.00) to be paid for the benefit of the minor to the guardian of the person or to the natural guardian or to the person or agency by whom the minor is maintained or to the minor;

(2) any amount in cash of a resident or non-resident minor to be deposited in one or more savings accounts in the name of the minor in banks, building and loan associations, savings and loan associations or credit unions, deposits in which are insured by a Federal governmental agency, provided that the amount deposited in any one such savings institution shall not exceed the amount to which accounts are thus insured, or in one or more accounts in the name of the minor investing only in securities guaranteed by the United

the parties requested a hearing to approve their settlement agreement before former-judge Paul Pozonsky,[8] because it impacted the rights of the Hallowiches' minor children, Nathan and Alyson. Plaintiffs' petition for approval of settlement of minors' action pursuant to Pa.R.C.P. 2039 and Local Rule 2039.1, 7/28/11, at 2., The plaintiffs and defendants jointly moved that their settlement hearing be "in closed court or in chambers." Joint motion for scheduling order, 8/11/11, at 1. Attached to the joint motion was the following "**[PROPOSED] SCHEDULING ORDER**:"

And now, this 11th day of August, 2011, upon consideration of the joint motion for scheduling order,

States government or a federal governmental agency managed by responsible financial institutions. Every such order shall contain a provision that no withdrawal can be made from any such account until the minor attains majority, except as authorized by a prior order of the court. Proof of the deposit shall be promptly filed of record;

(3) an agreement be executed providing for a structured settlement underwritten by a financially responsible entity that assumes responsibility for future payments. All moneys paid from the structured settlement during minority shall be paid into a restricted account as provided by subdivision (b)(2) of this rule;

(4) a trust agreement be executed with a corporate fiduciary which is independent from the minor and anyone acting on the minor's behalf and is lawfully authorized to engage in trust business in Pennsylvania or the state of the minor's domicile, which trust

(i) is designated to receive the fund;

(ii) contains such terms for investment, disbursement and distribution of the fund as the court deems proper; and

(iii) expressly provides that it is subject to the court's continuing jurisdiction, including the court's right to modify or terminate, for cause shown, although the trust may be otherwise irrevocable.

(c) When a judgment has been entered in favor of a minor plaintiff and no petition has been filed under the provisions of subdivision (b) of this rule, the amount of the judgment or any part thereof shall be paid only to a guardian of the estate of the minor qualified to receive the fund, unless the court, on its own motion or on petition of a person, not a party to the action, representing the interest of the minor, enters an order under subdivision (b) of this rule.

(d) Nothing contained in this rule shall prevent the payment into court of any money by the defendant.

8. He resigned this bench, effective June 29, 2012, while the press were appealing his order in this matter.

this court hereby schedules a hearing in closed court or in chambers on (i) plaintiffs' petition for approval of settlement of minors' actions pursuant to Pa. R.C.P. 2039 and local rule 2039.1 and (ii) the joint motion to file petition for approval of settlement of minors' actions under seal for Wednesday, August 24, 2011, or as soon thereafter as suits the convenience of the court.

BY THE COURT:

/s/ Paul Pozonsky, J.

*Id.*, PROPOSED ORDER at 1.

Below the signature line, in handwriting, appears the phrase, "HEARING TO BE HELD _____ AT _____" *Id.* Into those blanks is then written, in a different hand and ink, the words "August 26, 2011" and "11:00 a.m." *Id.* Taken together, the addendum to the [proposed] scheduling order reads, "HEARING TO BE HELD <u>August 26, 2011</u> AT <u>11:00 a.m.</u>" *Id.* Thus, the order appeared to schedule the hearing on both August 24, 2011 and August 26, 2011.

Instead, the settlement hearing was held on August 23, 2011 — *prior* to either date in the order. Opinion pursuant to Pennsylvania Rule of Appellate Procedure 925(a), 4/2/12, at 2. Nothing appears of record to request that the hearing be conducted sooner, and the August 11, 2011 [proposed] scheduling order was not vacated. Even so, reporters from the Pittsburgh Post-Gazette appeared on August 23, 2011 and requested admittance into the *in camera* hearing, which was denied. *Id.* The record was sealed that day.

The press filed their respective petitions and motions to unseal, which were denied by a January 31, 2012 order, as untimely under Pennsylvania Rule of Civil

Procedure 2327.[9] They appealed. The Superior Court of Pennsylvania vacated that order and remanded to this court with instructions "to rule on the merits of appellants' petitions." *Hallowich v. Range Resources Corp.*, Nos. 234 & 235 WDA 2012,2 (Pa. Super. 2012) (memorandum opinion).[10] The appellate court wrote:

We emphasize that the only information about this matter available to the public was the trial docket, which stated the hearing was scheduled for "08-26-2011, at 11:00 A.M." Docket, at 5. Furthermore, the docket paraphrased appellees' joint motion for a hearing and stated their requested date of "Wednesday, 08-24-2011, or as soon thereafter as suits the convenience of the court." *Id.* The docket, however, included no information that the court would instead hold the hearing earlier-not only three days before the date stated in its in [sic] scheduling order, but also one day before the date requested by appellees. In addition, we note appellees sought to seal the entire record, and not just the settlement agreement, and the court granted appellees' joint motion to seal the record on *the same*

---

9. Pennsylvania Rule of Civil Procedure 2327 provides:
At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if
(1) the entry of a judgment in such action or the satisfaction of such judgment will impose any liability upon such person to indemnify in whole or in part the party against whom judgment may be entered; or
(2) such person is so situated as to be adversely affected by a distribution or other disposition of property in the custody of the court or of an officer thereof; or
(3) such person could have joined as an original party in the action or could have been joined therein; or
(4) the determination of such action may affect any legally enforceable interest of such person whether or not such person may be bound by a judgment in the action.
10. A memorandum opinion is binding precedent when, *inter alia*, "it is relevant under the doctrine of law of the case...." Internal operating procedures of the Superior Court § 65.37(A.).

*day* it was filed.

We agree with the observer-reporter's reasoning that it "had no interest [in the underlying action] which would justify intervention until the record was sealed." *See* observer-reporter's brief at 13. In light of all the foregoing, we hold the court should have liberally construed rule 2327 and accepted as timely filed both appellant's petitions to intervene and to unseal the record. Accordingly, we vacate the court's denials of the petitions, remand for the court to rule on the merits of the petitions, pursuant to *PA ChildCare LLC*[11] and relevant authority. The court may request briefs and hold hearings.

*Id*, 11 (emphasis in original).

Upon remand, the undersigned assumed jurisdiction; received briefs from the press and defendants; and scheduled an evidentiary hearing for January 18, 2013. However, both sides claimed that the burdens of production and proof rested with their opponents. No testimony or additional evidence was presented. The hearing morphed into oral arguments on common and constitutional law.

The press assert two theories to support their motions to unseal: a constitutional attack upon the August 23, 2011 order sealing the record and the common-law right of access to court records. Intervenors' joint brief in support of PG publishing company's and observer publishing company's motion to unseal record, 1/8/13, at 9. Their constitutional challenge is twofold. To wit, the Order is repugnant to both article I, §11 of the constitution of the Commonwealth of Pennsylvania[12] and also amendment I

---

11. *PA ChildCare LLC v. Flood*, 887 A.2d 309 (Pa. Super. 2005).

12. Article I, § 11 of the constitution of the Commonwealth of Pennsylvania provides:

All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of

of the constitution of the United States.[13] *Id.* Defendants counter that the press cannot satisfy those tests, because their "mere curiosity in this private matter is in no way protected by the first amendment or the common law of this Commonwealth." Brief in opposition to motion to unseal record, 1/16/13, at 2. They also claim, for the first time after remand, that unsealing the record would, itself, violate our state constitution, because this court would be invading their rights of privacy. *Id.* at 6.

## Scope and Standard of Review

When a case is remanded, this court is bound by "the judgment or other order of the appellate court...." Pennsylvania Rule of Appellate Procedure 2591. Nothing in the appellate order or opinion limits this court's scope of review, so it remains plenary. However, the Superior Court of Pennsylvania set a specific standard for this court to apply in reviewing the press' motions:

Under the constitutional approach...the party seeking closure may rebut the presumption of openness by showing that closure serves an important governmental interest and there is no less restrictive way to serve that

---

law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the legislature may by law direct.

13. Amendment I of the constitution of the United States provides: Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

Amendment I is incorporated to the several States through amendment XIV, § 1 of the constitution of the United States, as follows:

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state where in they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

*See Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625 (1925).

interest. Under the common law approach, the party seeking closure must show that his or her interest in secrecy outweighs the presumption of openness.

*Hallowich, supra.*, 9, *quoting PA ChildCare LLC v. Flood*, 887 A.2d 309, 311-12 (Pa. Super. 2005). As to defendants' state-constitutional claims of a right of privacy, this court evaluates them in light of the factors in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991).

Analysis

It is not necessary to pass upon the press' constitutional arguments, because the common law, as stated above, compels reversal of the August 23, 2011 order. Therefore, the defendants' claims of a constitutional right-of-privacy is ripe for adjudication. Whether a right of privacy for business exists within the penumbral rights of Pennsylvania's constitution is a matter of first impression. It does not.

The case of *PA ChildCare LLC v. Flood* was one of the first steps in uncovering the now infamous "Kids for Cash Scandal", in which former, common-pleas judges Mark Ciavarella and Michael Conahan accepted $2.6 million in bribes from PA ChildCare to impose unduly harsh sentences on juvenile offenders. *U.S. v. Conahan*, January 26, 2009 Information (M.D. Pa. No. 3:-09-CR-28). Luzerne County Controller Stephen Flood became suspicious when Conhan sealed the record of both his order closing the county's detention center and of PA ChildCare's $58 million lease to operate its privately-run facility, in 2004. *PA ChildCare LLC, supra.*, 310-11. Flood gave the Pennsylvania Department of Public Welfare's audit of PA ChildCare to the media. *Id.* It disclosed that PA ChildCare would, under that lease, receive the highest *per diem* in the state by greatly overcharging the county. *Id.*, 311.

To prevent the controller from discovering its (and the judges') illegal activities, PA ChildCare sued flood on December 17, 2004, and Conahan enjoined his investigation. *Id.* The judge sealed that record, too. *Id.* The Times Leader[14] petitioned to intervene and challenged Conhan's order to seal the record, raising the same constitutional challenge and common-law right of access that the press now assert. *Id.* Conahan summarily denied The Time Leader's petition without a hearing. *Id.*

In reversing and unsealing the record, the Superior Court of Pennsylvania employed "the constitutional analysis to determine whether ChildCare overcame the presumption of openness," because The Times Leader was "a newspaper seeking access on constitutional grounds to a matter involving public figures and public money." *Id.* 312. In other words, Conahan, by sealing a record involving elected officials, public funds, and the juvenile-justice system from both public and press, invited the highest degree of judicial scrutiny. The weightiness of those factors coalesced, compelling the court to address The Times Leader's constitutional rights.

Courts generally reach constitutional questions only after exhausting all other avenues of resolution. "The court will not pass upon a constitutional question although properly presented on the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483 (1936) (Brandeis, J., concurring). "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the court will decide only the

---

14. Founded in 1879, The Times Leader publishes a daily newspaper and online news in Wilkes-Barre, Pennsylvania. The Times Leader, "contact the times leader" (available at: http://www.timesleader.com/section/contact/, 2/28/13).

latter." *Id.*[15] This court's avoidance of constitutional issues stems from "the cardinal principle of judicial restraint — if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs, Inc. v. DEA*, 360 U.S. App. D.C. 344, 357, 362 F. 3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment). Unlike in *PA ChildCare LLC*, the Supreme Court of Pennsylvania refused to reach a newspaper's first amendment claim, when the common-law right required that a record be unsealed. *Commonwealth v. Fenstermaker*, 515 Pa. 501, 530 A.2d 414 (1987).

This court likewise declines to adjudge the press' constitutional claims, because the common-law rule dictates reversal of the August 23, 2011 order. As the defendants admitted, in resolving this issue, "a court must determine whether the interest in keeping the information private *rebuts the presumption* that the information be accessible to the public, such as in the case where disclosure of the information to be sealed would work an injury to the parties in litigation." Defendants' joint brief in opposition to PG etc., 9/19/11, at 7 (emphasis added). Having acknowledged the presumption of openness, defendants proffered no evidence showing a potential injury to themselves at the January 18, 2013 hearing.

Instead, defendants attempted to shift the burden to the press. "[T]hey have the burden of demonstrating to [the court] the reason why the right to privately [sic] settle these cases and negotiate such agreements should be overturned." January 18, 2013 court recording at 11:00.14 A.M. "[W]here the court has previously sealed the record, as is [sic] in the instant matter, the burden 'rest[s] upon the party seeking access to demonstrate good cause,

---

15. *See also Commonwealth v. Allsup*, 481 Pa. 313, 392 A.2d 1309 (1978) (constitutional questions are to be avoided when there exists other grounds for disposition of case).

explaining that "those seeking to maintain the situation of closure do not have to prove the need over again."" Brief in opposition to motion to unseal record, 1/16/13, at 14 *quoting In re Estate of duPont*, 606 Pa. 567, 573, 2 A.3d 516, 520 (2010).

At first blush, this quote from an unanimous Supreme Court of Pennsylvania would seem to overrule *PA ChildCare LLC*, but it is out of context and a misrepresentation of the case. The statement is not *duPont*'s holding. It is from Justice Saylor's recitation of the procedural posture, and his analysis begins three pages later. The justice's unabridged quote is:

> Additionally, and of particular relevance, the Superior Court recognized that a request to open records previously sealed by court order presents a distinct issue from whether records of proceedings should be sealed in the first instance. Noting that this constitutes an issue of first impression in Pennsylvania, the court referenced federal cases and a legal encyclopedia for guidance, ultimately concluding that there are no grounds for an automatic reopening of a previously-sealed record. Hence, the court found the burden to rest upon the party seeking access to demonstrate good cause, explaining that "those seeking to maintain the situation of closure do not have to prove the need over again." *Id.* at 639 (*citing, inter alia, F.D.I.C. v. Ernst & Ernst*, 677 F.2d 230,232 (2d Cir.1982)

*In re Estate of duPont, supra.*, 573, 519 (2010).

An orphans' court sealed the *duPont* record, which concerned an incapacitated person's estate. *Id.*, 569, 517. A third party, claiming to be a beneficiary of an estate-created trust, sought information as to whether he had a cause of action against that estate. *Id.* He appeared nearly a decade after the record had been sealed pursuant to 20

Pa. C.S. § 5511(a).[16] *Id.* The press, unlike the *duPont*

16. 20 Pa. C.S. § 5511(a) provides:

(a) Resident.—The court, upon petition and hearing and upon the presentation of clear and convincing evidence, may find a person domiciled in the Commonwealth to be incapacitated and appoint a guardian or guardians of his person or estate. The petitioner may be any person interested in the alleged incapacitated person's welfare. The court may dismiss a proceeding where it determines that the proceeding has not been instituted to aid or benefit the alleged incapacitated person or that the petition is incomplete or fails to provide sufficient facts to proceed. Written notice of the petition and hearing shall be given in large type and in simple language to the alleged incapacitated person. The notice shall indicate the purpose and seriousness of the proceeding and the rights that can be lost as a result of the proceeding. It shall include the date, time and place of the hearing and an explanation of all rights, including the right to request the appointment of counsel and to have counsel appointed if the court deems it appropriate and the right to have such counsel paid for if it cannot be afforded. The Supreme Court shall establish a uniform citation for this purpose. A copy of the petition shall be attached. Personal service shall be made on the alleged incapacitated person, and the contents and terms of the petition shall be explained to the maximum extent possible in language and terms the individual is most likely to understand. Service shall be no less than 20 days in advance of the hearing. In addition, notice of the petition and hearing shall be given in such manner as the court shall direct to all persons residing within the Commonwealth who are sui juris and would be entitled to share in the estate of the alleged incapacitated person if he died intestate at that time, to the person or institution providing residential services to the alleged incapacitated person and to such other parties as the court may direct, including other service providers. The hearing may be closed to the public and without a jury unless the alleged incapacitated person or his counsel objects. The hearing shall be closed and with or without a jury if the person alleged to be incapacitated or his counsel so requests. The hearing may be held at the residence of the alleged incapacitated person. The alleged incapacitated person shall be present at the hearing unless:

(1) the court is satisfied, upon the deposition or testimony of or sworn statement by a physician or licensed psychologist, that his physical or mental condition would be harmed by his presence; or

(2) it is impossible for him to be present because of his absence from the Commonwealth. It shall not be necessary for the alleged incapacitated person to be represented by a guardian ad litem in the proceeding.

Petitioner shall be required to notify the court at least seven days prior to the hearing if counsel has not been retained by or on behalf of the alleged incapacitated person. In appropriate cases, counsel shall be appointed to represent the alleged incapacitated person in any matter for which counsel has not been retained by or on behalf of that individual.

petitioner, expressed interest in this case prior to the sealing of the record.

As the Superior Court of Pennsylvania held, "We agree with the observer-reporter's reasoning that it 'had no interest [in the underlying action] which would justify intervention until the record was sealed.'" *Hallowich, supra,* 12, *quoting* observer-reporter's appellate brief at 13 (brackets in original). Imposing the burden of proof upon the Press, on the grounds that the record has already been sealed, would repeat Pozonsky's error. This would frustrate their rights of intervention on a technicality of timing for not formally appearing before having an interest to do so.

Moreover, the *duPont* petitioner sought to open the record for what amounted to pre-complaint discovery for personal gain, whereas the press do not pursue self-interest. *In re Estate of duPont, supra.* They intervene to vindicate the public's right of access to its courts and to information, upon which the entire foundation of a free press is predicated. Freedom to publish information about our government does the press little good, if the government withholds that which they seek to publish. This is the basis for the common-law presumption of openness.

In addition, *duPont* involved a legislative modification of the common-law test and is legally distinguishable. Again, from Justice Saylor, the actual holding of *duPont*:

Here, by contrast, and as discussed, *the common law presumption of public access has been modified by the general assembly in the context of incapacitation proceedings* in an effort to protect the rights of individuals with regard to personal information that could be damaging if exposed publicly. Moreover, Appellant has not articulated any basis to believe that private financial, medical, and psychiatric records — items that would

ordinarily become part of the record of the proceedings on a section 5511(a) petition — become less private or sensitive over time, or otherwise lose their potential to subject the incapacitated person or his family to embarrassment or possible harassment, especially where significant financial assets are being managed. *Compare In re Widener's Estate*, 437 Pa. 294, 296, 263 A.2d 334, 335 (1970) (approving an orphans' court rule permanently impounding the testamentary writings of an individual adjudged incompetent as protective of his privacy rights), *with PA ChildCare LLC v. Flood*, 887 A.2d 309, 312 (Pa.Super.2005) (recognizing that the need for openness in judicial proceedings is especially pronounced in actions pertaining to the use of public funds and contracts with public entities).

*Id.* 579, 523 (emphasis added).

The Supreme Court of Pennsylvania recognized the differences between *duPont* and *PA ChildCare LLC*. The case that defendants rely upon to shift the burden upon the press is legally irrelevant and factually distinguishable. The burden remains upon defendants to demonstrate grounds for closure, *i.e.*, some harm that will befall them if the record is unsealed.

The grounds to rebut the presumption of openness are "to protect trade secrets, or the privacy and reputations [of innocent parties], as well as to guard against risks to national security interests, and to minimize the danger of an unfair trial by adverse publicity." *Hallowich, supra.*, 3, *quoting Hutchinson by Hutchison v. Luddy*, 417 Pa.Super. 93, 112, 611 A.2d 1280, 1290 (Pa. Super. 1992). Nothing of record divulges those enumerated grounds, because there are no facts concerning them. The record contains only unproven — and unanswered — allegations.

Having produced no evidence to rebut the presumption of openness under the common law, defendants have failed

to oppose the press' motions to unseal the record under *PA ChildCare LLC* and *Hutchinson.* Therefore, this court must grant those motions and reverse the August 23, 2011 order, unless a higher authority forestalls the common law's application.

Defendants claim that the presumption of access to our courts is repugnant to their rights of privacy under the constitution of the Commonwealth of Pennsylvania. They rely upon (1) the right of privacy,[17] generally; (2) enforceability of nondisclosure agreements; and (3) the public policy favoring settlements in civil proceedings.

Defendants argue "various zones of privacy including such matters as avoiding disclosures of personal matters, independence in making important decisions, as well as the fundamental right to be left alone." Brief in opposition to motion to unseal record, 1/16/13, at 7. In their brief, defendants make no distinction between the plaintiffs and themselves or between the named parties and the unnamed minors. When this court inquired whether the defendants had standing to assert the privacy rights of the Hallowiches' minor children, counsel explained:

> We're not stepping into the shoes of the minor children

---

17. In their brief, defendants emphasize privacy interests surrounding documents not of record. However, the press clarified at oral argument that their motions to unseal record are precisely that — motions to open this court's recorded documents, not an attempt to augment that record. As press' counsel explained:
> Court: So you're conceding that the court can't force the parties to bring documents or evidence or material to the court and add it to a record, once the record's closed?
> Frank: That's not it... The issue is *what's* there.

January 18, 2013 court recording at 11:12.07 A.M (emphasis in original).
> Frank: We ask the court to unseal the record. Whatever is there — that's what we get.

*Id.* at 11:41.42 A.M. The question, then, of whether the press may access documents not of record is not before this court, so it need not and will not consider it. *See Allsup, supra.*

to protect their privacy rights; we're protecting our right to negotiate a confidentiality agreement, which was mutually agreed upon by the parties. Not a unilateral confidentiality agreement, a mutual agreement. And we have a right to negotiate confidentiality provisions in order to save...in order to get judicial settlements — out-of-court settlements, out-of-the-public-eye settlements — to save our taxpayers and this court time and effort.

January 18, 2013 court recording at 10:55.26 A.M. The state constitutional issue before this court is therefore limited to the privacy rights of the defendants. Moreover, this court reads the word "parties" in defendants' brief to mean only them, unless the context clearly indicates both them and the plaintiffs.

In advancing interpretations of the constitution of the Commonwealth of Pennsylvania — especially novel ones — "it is important that litigants analyze at least the following four factors:

1) text of the Pennsylvania constitutional provision;

2) history of the provision, including Pennsylvania case-law;

3) related case-law from other states;

4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence."

*Commonwealth v. Edmunds, supra.*, 390, 895 (1991). Cautiously, the Supreme Court of Pennsylvania also allows that "an examination of related federal precedent may be useful as part of the state constitutional analysis, not as binding authority, but as one form of guidance." *Id.* Defendants failed to put forth an *Edmunds* analysis.[18]

---

18. Such a failure was originally fatal to a state-constitutional claim.

However, examining their claims to a right of privacy under *Edmunds'* factors is essential for a meaningful, state-constitutional review.

Although defendants ground their claimed right of privacy in article I of Pennsylvania's constitution (specifically, sections 1 and 8), they made no attempt to parse those texts or to construe them in light of the full document. Those sections provide:

## § 1. Inherent Rights of Mankind

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

and:

## § 8. Security from search and seizure

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Constitution of the Commonwealth of Pennsylvania Article I §§ 1, 8. Neither these provisions nor any other part of the

---

*See Commonwealth v. Peterfield*, 609 A.2d 540 (Pa. Super. 1992) (not briefing factors in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (Pa. 1991), results in the waiver of constitutional issue). It no longer is, but "we reaffirm [the *Edmunds* factors'] importance and encourage [their] use. In other words, *Edmunds* expresses the idea that it may be helpful to address the concerns listed therein, not that these concerns must be addressed in order for a claim asserted under the Pennsylvania constitution to be cognizable." *Commonwealth v. White*, 543 Pa. 45, 50, 669 A.2d 896, 899 (1995).

constitution explicitly announce a right of privacy.

Even so, courts of this Commonwealth have extrapolated the right of privacy from these clauses and others like them. After *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678 (1965),[19] the Supreme Court of Pennsylvania began to explore and develop privacy protections in the state charter, and, nearly 30 years later, a unanimous court would remark that "the right of privacy is a well-settled part of the jurisprudential tradition in this Commonwealth..." *Stenger v. Lehigh Valley Hospital Center*, 530 Pa. 426, 434, 609 A.2d 796, 800 (1992). However, nothing in that jurisprudence indicates that that right is available to business entities.

Article I, § 1 of our constitution, entitled "inherent rights of mankind," opens with a particularly striking phrase: "All men are born...." "Mankind" is defined as "1: the human race, the totality of human beings; 2. men especially as distinguished from women." Merriam-Webster Dictionary, definition of "mankind" (available at: http://www.merriam-webster.com/dictionary/mankind. 3/7/13). Through Article I, § 28,[20] the people of this Commonwealth extended legal rights, including those in article I, § 1, to women, as well as men. Consequently, women and men come into this world with "certain inherent and indefeasible rights," either expressed in the

---

19. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678 (1965), is the landmark case wherein the Supreme Court of the United States first recognized "that specific guarantees in the bill of rights have penumbras, formed by emanations from those guarantees that help give them life and substance. Various guarantees create zones of privacy." *Id.* at 484, 1681 (citations omitted). The court struck down Connecticut's statute banning the use of birth control as an impermissible governmental invasion into a husband and wife's right to decide privately their marital and familial concerns.

20. Article I § 28 of the constitution of the Commonwealth of Pennsylvania provides, "equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."

constitution or implied from its enumerated rights. Pa. Const. Art. 1, § 1.

There are no men or women defendants in the instant case; they are various business entities. Range Resources Corporation[21] is a corporation; Williams Gas/Laurel Mountain Midstream and MarkWest Energy Group, L.L.C. are limited-liability companies; and MarkWest Energy Partners, L.P. is a limited partnership. These are all legal fictions, existing not by natural birth but by operations of state statutes. For example, Range Resource Corporation is a publicly traded, Texas-based corporation, formed under the laws of Delaware. *See* 8 Del. C. § 101, *et seq.* Such business entities cannot have been "born equally free and independent," because they were not *born* at all. Indeed, the framers of our constitution could not have intended for them to be "free and independent," because, as the creations of the law, they are always subservient to it.

The various states, via acts of their legislatures, allow for business entities to exist but are not required to establish them. In the absence of state law, business entities are nothing. Once created, they become property of the men and women who own them, and, therefore, the constitutional rights that business entities may assert are not coterminous or homogeneous with the rights of human beings. Were they so, the chattel would become the co-equal to its owners, the servant on par with its masters, the agent the peer of its principals, and the legal fabrication superior to the law that created and sustains it Surely, what the people have incorporated, the text of Article I, § 1

---

21. Throughout its filings in this matter, Range Resource Corporation repeatedly drops footnotes highlighting the fact that the Hallowiches incorrectly identified it. It claims to do no business within the Commonwealth of Pennsylvania and that its subsidiary, Range Resource — Appalachia L.L.C., should have been the named defendant. Even if this is so, it is a distinction without a difference, because a limited-liability company is treated like other business entities under the constitution of the Commonwealth of Pennsylvania.

does not prohibit them from disincorporating or otherwise circumscribing its activities.

Had the framers intended the protections of article I, §1 to extend to business entities, they certainly could have written, "All persons are created equally free and independent...." They did not. Indeed, it is federal amendment XIV's use of the word "person" that makes its protections applicable to business entities, because its drafters were presumed to have known that "person" is a legal term of art, encompassing business entities under the common law. This was so clear that chief justice Waite ruled, prior to oral argument, that:

> The court does not wish to hear argument on the question of whether the provision in the Fourteenth Amendment to the constitution, which forbids a state to deny to any person within its jurisdiction the equal protections of the laws, applies to these corporations. We are all of the opinion that it does.

*Santa Clara County v. Southern Pac. R. Co.*, 118 U.S. 394, 6 S.Ct. 1132 (1886) (syllabus).

Critically, the exact opposite conclusion is derived from plain language of article X of the constitution of the Commonwealth of Pennsylvania. It provides, in pertinent part:

> § 2. Certain charters to be subject to the constitution

> Private corporations which have accepted or accept the constitution of this Commonwealth or the benefits of any law passed by the general assembly after 1873 governing the affairs of corporations shall hold their charters subject to the provisions of the constitution of this Commonwealth.

> § 3. Revocation, amendment, and repeal of charters

and corporation law

> All charters of private corporations and all present and future common or statutory law with respect to the formation or regulation of private corporations or prescribing powers, rights, duties or liabilities or private corporations or their officers, directors or shareholders may be revoked, amended or repealed.

Not only did our framers know how to employ the names of business entities[22] when and where they wanted them (as the above text demonstrates), they used those words to subjugate business entities to the constitution. Unlike "[a]ll men (and women)," who are "born equally free," Pa. Const. Article I, § 1, the framers permitted the Commonwealth to revoke, amend, and repeal "[a]ll charters of private corporations" and any "powers, *rights*, duties or liabilities" of corporations. Pa. Const. Article X, § 3 (emphasis added). Thus, the constitution vests in business entities no special rights that the laws of this Commonwealth cannot extinguish. In sum, defendants cannot assert the protections of article I, § 1, because they

---

22. For example, unlike the constitution of the United States wherein the word "corporation(s)" never appears, the framers of the constitution of the Commonwealth of Pennsylvania wrote that word 23 times. All such uses limit corporations; none grants them rights. *See* Pa. Const. Article III, § 18 (statutes of limitations in civil cases may not be shorter for corporations than for other defendants); Article III, § 29 (appropriations to "denominational and sectarian" corporations prohibited); Article III, § 31 (corporation cannot be delegated governmental functions); Article III, § 32 (no special law shall create a corporation or amend, renew, or extend a corporation's charter); Article V, § 17 (judicial officers may not hold office in municipal corporations); Article VIII, § 2(b)(iii) (General assembly may exempt charitable corporations from taxation); Article VIII, § 6 (power to tax corporations cannot be surrendered or suspended by contract); Article VIII, § 8 (corporation cannot be creditor to the Commonwealth; Commonwealth cannot own a corporation) Article VIII, § 17 (Commonwealth may provide aid to corporations harmed by acts of God in the early and mid-1970's); Article IX, § 9 (local governments cannot own a corporation); *sand* Article X (private corporations subordinate to the Commonwealth and its laws).

are not mentioned in its text.[23]

As for the defendants' claims of protection under article I, § 8, again, the "people", not business entities, are the subject of its initial clause. If the framers had intended this section to shield corporations, limited-liability corporations, or limited partnerships, this court presumes that they could and would have used those words. The plain meaning of "people" is the living, breathing humans in this Commonwealth.[24]

This court therefore holds that the texts of article I, §§ 1, 8 cannot be relied upon by business entities to emanate penumbras, which amalgamate in a right of privacy for defendants. Per the plain language of those sections and the business-specific interdictions of article X, they have no such right.

Furthermore, there is no reference to Pennsylvania constitutional history in defendants' brief, which itself suggests that they found no evidence of legislative intent to extend article I protections to business entities. An exploration of that history strongly indicates that the founders of the Commonwealth had no such intentions.

The Commonwealth's current constitution is the product of the fifth constitutional convention since our independence, which convened on December 1, 1967. *See* The preparatory committee for the constitutional convention, *Ref. Manual No. 3: A History of Pennsylvania Constitutions* [Harrisburg

---

23. The defendants have not asserted their rights under the federal constitution, and whatever privacy rights they may have under it are waived. That said, this court knows of no case where the federal courts have extended the right to privacy under the constitution of the United States to business entities.

24. This court is not asked, and so it does not now say, that the people who work in the offices of a business entity forgo their rights to be free from unreasonable searches and seizures at the office door. On the contrary, the second, independent clause of that section, beginning "no warrant to search any place...." would seem sufficiently broad enough to require probable cause for a search of those people's workplaces. Pa. Const. Article I, § 8.

1967]. The provisions relied upon by defendants have remained substantially unchanged from their forms in the constitution of 1776,[25] although their placement within subsequent constitutions has varied.[26] *See* The preparatory committee for the constitutional convention, *Ref. Manual No. 2: Constitutions of Pennsylvania; Constitution of the United States* [Harrisburg 1967]. In the constitution of 1790, "the bill of rights remained unchanged, for these were issues on which liberals and conservatives were agreed." *Ref. Manual No. 3, supra.* at 5. The 1838 version of "the bill of rights was carried over verbatim from the constitution of 1790." *Ref. Manual No. 1, supra.*, at 4. The constitution of 1873 contained only a few revisions to article I, which did not impact sections 1 or 8. *See Ref. Manual No. 3, supra.* Finally, the only alteration made to those sections at the 1967-1968 convention was the replacement of the word

---

25. There were no articles in the 1776 constitution; instead, the drafters employed textual headings, such as "A declaration of the rights of the inhabitants of the Commonwealth, or State of Pennsylvania." The preparatory committee for the constitutional convention, *Ref. Manual No. 2: Constitutions of Pennsylvania; Constitution of the United States* at 234 [Harrisburg 1967]. Under that heading — which is the document's first — is the predecessor of our current article I, § 1, which provided:

First. That all men are born equally free and independent, and have certain natural, inherent and inalienable rights, amongst which are, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety.

*Id.* Then, the tenth paragraph, under that same heading, is the origin of our current article I, § 8, which provided:

Tenth. That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described are contrary to that right, and ought not to be granted.

*Id.* at 236

26. In the 1790 convention, the declaration of rights was moved to the end, as article IX, and the prohibition against unreasonable searches and seizures became the declaration's eighth section. *Id.* at 205-207. The 1837 convention restored the declaration of rights as the constitution's initial pronouncements in article I. *Id.* at 11.

"natural" in section 1's title with "inherent". *Ref. Manual No. 2, supra.*, at 11. Given that all of the conventions subsequent to 1776 reincorporated article I, §§ 1, 8 virtually unchanged, this court's interpretation of those sections is properly informed by the 1776 framers' legislative-intent in authoring those provisions.

The majority of the 1776 constitutional convention delegates was comprised of poorer Pennsylvanians from the agrarian, western counties, because that convention had been called by the "provincial conference of the committees of correspondence," which suspected the wealthier Philadelphians of holding British loyalties. *Ref. Manual No. 3, supra.*, at 1. Thus, the constitution they created "was one of the most liberal and influential" of the new nation. *Ref. Manual No. 1, supra.*, at 2. Dr. Benjamin Franklin presided over that convention, and his theories on government, as well as those of William Penn, greatly influenced the delegates. *Id.*

In 1682, Pennsylvania, like all American colonies, began as a business venture on behalf of the crown: *i.e.*, as a proprietorship under Penn's absolute control, in which "some 600 investors bought shares." Randall M. Miller and William Pencak, *Pennsylvania: A History of the Commonwealth*, at 64 (2002). Penn, however, "reluctantly signed the charter of Privileges that remained the constitution of the colony until the American Revolution." *Id.* at 66. That charter granted suffrage to most freed men, the assembly self-governance (though the proprietor and governor held veto power), and unprecedented religious freedoms. *Id.* Plainly, the charter of privileges did not vest rights within Penn's business which oversaw the colony, because, having absolute authority otherwise, it needed nonc.[27] Instead, the charter

---

27. In King Charles II's Patent to William Penn, establishing the province and Seigniory of Pennsylvania, the Crown required that any legal disputes over interpretation of the patent between the Penns and the settlers were to "be adjudged most advantageous and favorable to the

guaranteed to settlers that they would not forfeit their rights as Englishmen to Penn's business upon emigrating into its territory.

Those rights were codified in *Magna Charta*, which Penn read as reasserting rights that had always been. For him:

> [T]hough it be said here, that the king hath given and granted these Liberties, yet they must not be understood as mere emanations of royal favour, or new bounties granted, which the people could not justly challenge, or had not a right unto before; for the Lord Cook[28] in divers places asserts, and all lawyers know, that this charter is for the most part only declaratory of the principal ground of the fundamental laws and liberties of England. No new freedom is hereby granted, but a restitution of such lawfully they had before, and to free them of what had been usurped and encroached upon by any power whatsoever, and therefore you may *see* this charter often mentions *sua jura*, their rights and liberties, which shows they had them before, and that the same now were confirmed.

William Penn, *The Excellent Privilege of Liberty and Property*, "comment on *Magna Charta*" at 44-45 (1687, reprinted 1897 by the Philobiblon Club). It was logical for Penn, as Proprietor of Pennsylvania, to concede that the province and Seigniory of Pennsylvania, itself a product of the laws of England, could not divest its settlers of

---

said William Penn his heirs and assigns...." William Penn, The excellent privilege of liberty and property, "An abstract of the patent granted by the King to William Penn and his heirs and assigns" at 101 (1687, reprinted 1897 by the Philobiblon Club).

28. Penn is referring to the lord chief justice, Sir Edward Coke, whose name Penn spelled phonetically, because, even though his name is now uniformly spelled "*C-oke*," the chief justice's name is correctly pronounced, in the Elizabethan English of his day, as "*C-ook*." Originally, it was as often spelled one way as the other.

their rights under that law. But nothing in his writings on liberty suggests that Penn thought that those rights inured to business.

Penn also had a strong respect for privacy of the individual, as a crucial ingredient of true happiness and enjoyment of life. He viewed that privilege as redounding to the common person, as opposed to rulers and "Grandees... For they live least alone: And they that must be enjoyed by every body, can never enjoy themselves as they should. It is the advantage little Men have upon them; they can be private." William Penn, *Some Fruits of Solitude* at 349 (1693, reprinted 1965 by the P.F. Collier & Son Corp.). It is hard to conceptualize the business entities now at bar as the "little Men" to whom Penn was referring. In fact, he viewed himself and his own proprietorship over the colony as lacking such privacy:

> Hardly any thing is given us for our Selves, but the Publick may claim a Share with us. But of all we call ours, we are most accountable to God and the Publick for our estates: In this we are but Stewards, and to Hord up all to ourselves is great Injustice as well as Ingratitude.

William Penn, *More Fruits of Solitude* at 390 (1702, reprinted 1965 by the P.F. Collier & Son Corp.). It is highly improbable that Penn founded Pennsylvania with an eye towards securing liberty for business entities or to grant them a right of privacy.

An even more dubious proposition is that the framers of the constitution of 1776, given their egalitarian sympathies, would have concerned themselves with vesting, for the first time in history, indefeasible rights in such entities. This court has found no documentation from the era indicating that they were so inclined. Moreover, given that a majority of the delegates who authored article I were farmers from

the young Commonwealth's frontier,[29] with little or no ties to institutionalized business, it seems most likely that they intended their words in the article to convey solely and precisely their plain-language meanings. As stated above, that language therein extends only to natural persons. Thus, the history of the 1776 convention and legislative intent that that history indicates point away from the constitutional interpretation urged by the defendants.

Their argument is equally unavailing under this Commonwealth's cases that have applied the terms of article I, as our courts have never extended the constitutional right of privacy to a corporation, company, or partnership. The vast majority of cases that deal with privacy concerns are criminal matters, focused on the suppression of evidence under article 1, § 8. *See Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (defendant's expectation of privacy in banking record granted standing to challenge admissibility of such record, which had been seized under invalid subpoena); *Commonwealth v. Edmunds, supra.* (defendant's right of privacy does not allow the federal "good faith" exception to the warrant requirement under Pennsylvania constitutional law); *and Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185 (reaffirming that a police dog's sniff is a search, but, when done outside defendant's vehicle, there is a lesser expectation of privacy, so only reasonable

---

29. The committee to essay a declaration of rights at the constitutional convention of 1776 was comprised of Owen Biddle (City of Philadelphia), Col. John Bull (Philadelphia County), the Rev. William Vanhorn (Bucks County), John Jacobs (Chester County), Col. George Ross (Lancaster County), James Smith (York County), Jonathan Hoge (Cumberland County), Jacob Morgan (Berks County), Col. Jacob Stroud (Northampton County), Col. Thomas Smith (Bedford County), Jacob Martin (Northumberland County), and John Moore (Westmoreland County). *The Proceedings Relative to Calling the Conventions of 1776 and 1790*, minutes of the convention of 1776, at 45-48 [Harrisburg 1825]. Even by today's standards, only four of those delegates (Biddle, Bull, Vanhorn, and Jacobs) would be considered to live within the city or suburbs of Philadelphia. At best, urban delegates were outnumbered two-to-one.

suspicion is required). None of those cases extended the right of privacy to business entities, because business entities were not on trial.

Defendants rely heavily upon *Denoncourt v. Pennsylvania State Ethics Comm.*, 504 Pa. 191, 470 A.2d 945, and *Stenger v. Lehigh Valley Hospital Center, supra*. Again, neither of these cases involved business entities or indicate that such entities have a right of privacy. *Denoncourt* declared unconstitutional a statute that required the immediate family members of candidates for office to disclose their financial interests, because it violated the due process clause. In part II of the analysis, there is dicta that also found the act an impermissible invasion of the right of privacy; however (aside from being unnecessary, given the due-process holding in part I) only three Justices joined part II.[30] Thus, it was not a majority opinion and is not binding precedent.

Even if it were, the right of privacy was invoked to protect people, not business. In explaining the basis of the right, Justice Flaherty quoted Justice Brandeis' famous dissent in *Olmstead v. United States*, 277 U.S. 438, 48 S. Ct. 564 (1928):

The makers of our constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone — the most comprehensive of rights and the right most valued by

---

30. Chief Justice Roberts joined part I of the opinion, justice Hutchison concurred only in the result, and justices Nix and Larsen dissented. That left justices McDermott and Zappala to join in part II of justice Flaherty's opinion.

civilized men.

*Id.* 572, 956 (Brandeis, J., dissenting).

It is axiomatic that corporations, companies, and partnership have no "spiritual nature," "feelings," "intellect," "beliefs," "thoughts," "emotions," or "sensations," because they do not exist in the manner that humankind exists. Thus, the entire rationale underpinning Justice Brandeis' construction of the Constitution of the United States — and also, by his reliance upon it, Justice Flaherty's construction of our own — is simply inapplicable to them. They cannot be "let alone" by government, because businesses are but grapes, ripe upon the vine of the law, that the people of this Commonwealth raise, tend, and prune at their pleasure and need.

*Stenger* involved the privacy interests that AIDS victims have in their medical records. Obviously, such a claim was not, and never could be, asserted on behalf of business, because they do not have medical records. But from that case springs a progeny of privacy cases protecting the bodily integrity of human beings. *See In re Duran,* 769 A.2d 497, 503 (Pa. Super. 2001) ("right to control integrity of one's body" is fundamental to "personal autonomy"); *In the Matter of T.R.,* 557 Pa. 99, 731 A.2d 1276 (mother's right of privacy prohibited trial court from ordering her to have psychological evaluation and disclosure of results in juvenile dependence proceeding); *Estate of C.W.,* 433 Pa. Super. 167, 640 A.2d 427 (1994) (forced sterilization of incompetent person implicates fundamental right to procreate and is only permitted upon showing that the sterilization is in the incompetent's best interest).

A business entity has none of these private concerns. Thus, our Commonwealth's case law has not established a constitutional right of privacy to shield them from our laws. Nor would the rationale of those cases be applicable

to businesses, via analogy.

In addition, defendants provided no cases from any of our sister states, as required in the *Edmunds* analysis, to show that a business-entity right of privacy is recognized anywhere in our nation. This court's research revealed only two other courts that have dealt directly with this question.

In *Roberts v. Gulf Oil Corp.*, 147 Cal. App. 3d 770, 195 Cal. Rptr. 393 (1983), the oil company opposed a county tax-assessor's subpoena *duces tecum*, compelling its employee to produce records regarding its realties, on the grounds that under article I, § 1 of the California constitution[31] it had a right of privacy. The appellate court held, "[t]he constitutional provision simply does not apply to corporations. The provision protects the privacy rights of *people*." *Id.* 791, 406 (emphasis in original). The judges highlighted that their drafters, like our own, avoided the word "persons", which, had it been employed, might have included business entities. Use of the word "people" prohibited such a construction. "Nowhere in the statutes of California or elsewhere have we found the word 'people' to be defined to include corporations." *Id.* 793, 408.

The Supreme Court of Montana reached the same conclusion under its constitution, in a matter substantially similar to the one *sub judice. Great Falls Tribune v. The Montana Public Service Comm.*, 2003 MT 359, 319 Mont. 38, 82 P.3d 876 (2003), concerned a petition by the media to unseal the record of Montana's equivalent of the Pennsylvania Utility Commission. An electrical company asserted its then-existing right of privacy under

---

31. Article I, § 1 of the California constitution, which is more expansive in expressing rights than our own, provides:

All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

the Montana Constitution[32] to prevent that disclosure. In overruling its prior precedents that recognized a business-entity right of privacy, Montana's supreme court pointed out that it had previously "failed to engage in any meaningful [sic] language [sic] construction analysis or review of the constitutional convention history to determine whether the word 'individual' could reasonably be interpreted to include non-human entities such as corporations." *Id.* P21, 45, 880.

Upon engaging in a meaningful, language-construction analysis, the court found that the recordings of the constitutional convention clearly revealed the drafters' legislative-intent to deprive corporations and other businesses of any right of privacy. Delegate (and attorney) Dahood explained the phrase "individual privacy" to his non-lawyer colleagues. *Id.* P33, 48, 882. "A person...as you well know, [can] be defined to include a corporation under the law...An individual, in my judgment, would not be a corporation, no." *Id.* Thus, the court held that "the state constitutional right of privacy is afforded only to natural human beings and not to non-human entities such as corporations," because "there are no known rules of construction which permitted this court to summarily extend...the constitutional right of privacy to non-human entities under the ordinary and unambiguous definition of 'individual.'" *Id.* P36, 50, 883.

This court concurs with the nuanced, constitutional exegesis, which the California Court of Appeal and the Supreme Court of Montana applied in denying business entities a right of privacy under their states' charters. Their holdings are based upon an understanding of the word

---

32. The Montana Constitution provides, in pertinent part:
The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.
Montana constitution article 2, § 10.

"person" — as that term is employed at law — identical to this court's construction of that word. *Gulf Oil Corp.* and *Great Falls Tribune* strongly support the holdings reached above and are highly persuasive in reinforcing the conclusion that Pennsylvania's framers did not intend for business entities to have a right of privacy. Like the framers in California and Montana, the drafters of our article I avoided the word "person" and the legal connotations and consequences that accompany it.

This court found no case establishing a constitutional right of privacy for businesses, and it uncovered only one that allowed a corporation to assert a state-based right to be free from unreasonable searches and seizures in a criminal matter. The corporate entity of Zeta Chi Fraternity asserted that the warrantless search of its on-campus house was unconstitutional under the New Hampshire Constitution. *New Hampshire v. Zeta Chi Fraternity*, 142 N.H. 16, 696 A.2d 530 (1997). However, that supreme court engaged in no state-constitutional analysis as to whether a business could assert that right; it took the contention for granted. Indeed, the *Zeta Chi* court did not even include the New Hampshire Constitution's text in its opinion. Therefore, that case is unpersuasive for consideration of the issue at bar.

While clearly an emerging question in national jurisprudence, claims of a business-entity right of privacy have been discredited by the two courts that have directly considered it. This court now joins them in rejection of this novel, state-constitutional theory.

Finally, the policy considerations under the *Edmunds* test need to be addressed. In Pennsylvania, textualism and originalism are only the starting points for determining a constitutional question. Ours is very much, what legal scholars call, a living constitution, for "it is necessary to go beyond the bare text and history of [a] provision as it was drafted 200 years ago, and consider its application within the

modern scheme of Pennsylvania jurisprudence." *Edmunds, supra.*, 402, 901. Therefore, the policy concerns that the defendants raised to buttress their right-of-privacy claims are appropriate for this court to weigh under its *Edmunds* inquiry.

Defendants argue that unsealing the record would negate nondisclosure language in settlement agreements. In essence, they advance the right of freedom to contract. For them, "there is an overriding interest that trumps any right of access," *i.e.*, "preserving litigants' rights to enter into private, confidential settlement agreements to resolve disputes." Brief in opposition to motion to unseal record, 1/16/13, at 10.

They then turn to a judicial-economy argument. Defendants correctly note that, but for the press' intervention, this matter would be finished. They suggest that future litigants would be discouraged from entering settlements with minors, because Pa. R.C.P. 2039 would require them to disclose the terms of settlement to the court[33] and, through the court, to the public and press. *Id.* at 14. Thus, more cases that could be settled would go to trial.

Both of these contentions are without merit.

The proposition that nondisclosure language must be enforced is based upon a false presumption that this court is somehow bound by the terms of the settlement agreement. The court cannot breach its confidentiality provisions, because this court is not a party to that contract. Ergo, when the defendants claim that unsealing the record "would deprive litigants of their right to enforce a legal obligation — here confidentiality," that is simply not so. Brief in opposition to motion to unseal record, 1/16/13 at 10.

---

33. This court notes that the settlement agreement herein was not made a part of the record. *See* FN 17, *supra.*

Confidentiality runs only between defendants and the Hallowiches. Thus, the unsealing of this record leaves those obligations wholly intact, because the parties remain just as gagged from speaking of the terms and conditions of the settlement as they were prior to its unsealing. The press' and public's ability to obtain that information by another route, *i.e.*, the common-law right of access to our courts, does not impair the defendants' or the Hallowiches' obligations. It merely makes that obligation a poor choice for consideration by the defendants. They engaged in a free exchange of offers and made their own bad bargain, for it is hornbook law that "[i]t is not possible for courts to police the bargain of the parties in terms of their estimates of value." John Edward Murray, Jr. *Murray on Contracts* § 59 (4h ed. 2001). The plaintiffs, it would seem, received the better end of the confidentiality deal: publicity without loquacity.

As for defendants' insistence that unsealing the record will create trepidation for future litigants to engage in settlement agreements with minors, that *reductio ad absurdum* is equally unpersuasive. First, the purpose underpinning rule 2039 that brings minors' settlements into court records is to protect both the minors and the parties settling with them. In most situations, a minor may disaffirm a contract upon reaching the age of the majority. *See Murray* § 24. Parties seeking to settle with a minor gain an advantage under rule 2039 that the contract reached will more likely be enforced when the minor comes of age, because the court has imposed its imprimatur upon the deal. As for the minors, the rule is designed to allow the court to serve as an impartial arbitrator of the settlement and to ensure that the guardians do not take unfair advantage of the minors.

Second, it is that arbitral function by the court that implicates and necessitates the press' and public's right of access. The press' investigative role is itself a constitutional and common-law bulwark, safeguarding the courts from

lapsing into the clandestine abuses found in *PA ChildCare LLC*. It is not "mere curiosity" — as the defendants contend. The assertion that creating a business-entity right of privacy would aid judicial economy is unconvincing and pales by comparison to the press' and public's right of access.

Further, judicial economy will not necessarily be served by acquiescing to defendants' invitation to manufacture a business-entity right of privacy. For example, if the parties had settled *prior* to the Hallowiches filing a writ, rule 2039 would have been inapplicable to their property transaction,[34] and this court would have had no record to unseal. Had they approached each other amicably, as opposed to adversatively, the instant civil action would have never existed. Perhaps, today's ruling will encourage future litigants to seek alternative means of dispute resolution before resorting to the very public forum of our courts. If anything, this court's refusal to read a business-entity right of privacy into our constitution may well promote judicial economy in the long run.

Based upon all of the foregoing, this court holds that the presumption of openness under the common-law rule of access to the courts, which the defendants have not rebutted, demands that the August 23, 2011 order be reversed. Furthermore, there is no business-entity right of privacy within the constitution of the Commonwealth of Pennsylvania to prevent the operation of that rule. Accordingly, this court enters the following:

## ORDER

And now, March 20, 2013, it is hereby ordered, adjudged, and decreed that this court's August 23, 2011 order, which sealed the record in this matter, is reversed.

---

34. *See* plaintiffs' emergency petition for limited unsealing of the eecord and for a euling on the parties' settlement agreement and release, 11/14/2011.